Joseph Kempinski and Katherina Kempinski, Appellees, v. Tuthill Building Material Company, Appellant.

### Gen. No. 33,405.

Opinion filed January 2, 1930.

ALBERT G. MILLER, for appellant.

LEESMAN, ROEMER & SCHNELL, for appellee.

MR. JUSTICE RYNER delivered the opinion of the court.

The plaintiffs, husband and wife, in the month of May, 1923, purchased, as joint tenants, a piece of real estate in the City of Chicago, known, by street description, as 2114 West Sixty-third Street. It was improved with a two and one-half story brick building, which the plaintiffs and their family occupied as a residence from the time they purchased the property until the time of the trial.

The building was about 25 years old and was located near the rear of the lot. Immediately back of it was a garage which abutted upon the alley. The house and lot faced south on Sixty-third Street. Directly across the street from plaintiffs' property were flat buildings and west of the flat buildings were small stores and cottages. For a distance of about 150 feet directly east of plaintiffs' property was unimproved land. Directly west was a vacant lot, then a store building, then an unpaved street, and, about 50 feet west of the street, were the elevated tracks of the Pennsylvania Railroad Company. The elevation or embankment was occupied by a dozen or more tracks. There were two street-car tracks on Sixty-third Street. North of Sixty-third Street the railroad company had its switch and distributing yards, spreading out to the east and the west.

Back of the alley, in the rear of plaintiff's premises, and at a distance of about 60 feet, were sheds owned and occupied by the railroad company. In the same

vicinity was a tile yard with some of the tile piled to the level of the second-story window of the building used by the owners of the tile. The railroad company distributed its cars by means of a "hump" on its tracks, located about 50 feet south of Sixty-third Street. The process employed was to back a train up to the "hump," when the cars to be distributed were released and, passing north over the "hump," crossed the elevation over Sixty-third Street and moved, by their own momenta, to the various tracks.

In the fall of the year 1923 the defendant acquired the five lots just east of the plaintiffs' premises. In the year 1924 it erected upon these lots a plant for the manufacture of bricklayer's mortar. The building was about 140 feet long and 40 feet wide. It had a door and windows facing on Sixty-third Street. There were no windows on the west side. On the alley was a door and an entrance for bringing in lime with trucks. On the west side of the roof, near the middle of the building, was an opening through which sand was emptied into bins or hoppers located inside the building. Situated west of the building, and parallel with it, was a switch track upon which were operated cars to bring in the sand. West of the switch track was another track, on cement piers, upon which was operated a gasoline shovel and derrick. This track crossed the alley and went north, on an elevation, until it reached the top of the embankment of the Pennsylvania Railroad about 300 feet from the factory. In the operation of the plant, cars of sand were brought in by means of a switch engine and placed opposite the opening in the roof of the factory. By means of the derrick and shovel the sand was then elevated to the top of the building and dropped into the hoppers. Sand not thus disposed of was piled upon the defendant's property.

The defendant constructed a brick wall along the west side of its property, extending from the sidewalk on Sixty-third Street north to the front of plaintiffs'

building. It was originally about eight feet high, but is now about five feet in height. Apparently, the top of the wall was broken off because of the pressure of the sand piled against it. From the front of the plaintiffs' building, and north to the alley, the defendant constructed a retaining wall made of railroad ties laid against upright iron beams stuck into the ground.

On July 18, 1927, the plaintiffs instituted an action of trespass on the case against the defendant, in the superior court of Cook county. They filed a declaration consisting of six counts. In each count it was alleged that the plaintiffs were the owners of the property located at 2114 West Sixty-third Street, giving the legal description, that the building was occupied by them as a residence, and that, about the building, they maintained a garden and lawn. In each of the counts, except the sixth, the defendant was charged with maintaining a nuisance, and each concluded with the charge that the nuisance, complained of, resulted in great annoyance and discomfort to the plaintiffs, the members of their family and their guests and that by reason of such nuisance ''the premises, land, garden, lawn, home and residence of the plaintiffs were rendered incommodious, unhealthful and unfit for occupation and enjoyment for the purpose of a residence and a home, and were otherwise greatly and permanently injured.'' At the instance of the plaintiffs, each of the five counts was amended by striking out the concluding words, ''and were otherwise greatly and permanently injured.' The sixth count sounded in trespass for damages caused by the falling of the wall, constructed by the defendant, upon the plaintiffs' property and garden.

The first count charged the defendant with maintaining a nuisance in the following respects:

1. The defendant's factory was equipped with seven electric motors and a derrick and power shovel, operated by a gasoline engine, and the latter made much

noise. The motors were operated day and night, at variable speeds and produced different intensities of sound and vibration.

2. The derrick and shovel were operated from early morning until late in the afternoon, and produced great and disturbing noises, vibrations and jars.

3. The defendant deposited, upon its property, large amounts of loose sand in piles many feet high, and that it permitted the sand to blow over, fall upon, and permeate the plaintiffs' premises, including the building.

4. The piles of sand crowded against the plaintiffs' building, breaking the walls and windows.

5. Fumes and odors, as of burning lime, and black smoke or vapor escaped from the defendant's factory and passed over and upon the property of the plaintiffs' and into their residence and rooms.

The remaining counts averred, singly, the grievances complained of in the first count. To each count the defendant pleaded the general issue. A jury trial was had, resulting in a verdict in favor of the plaintiffs. Their damages were assessed at the sum of $1,750. Motions for a new trial and in arrest of judgment were overruled. Judgment was entered upon the verdict and the defendant appealed.

Marie Peters testified that she was a married daughter of the plaintiffs; that she had lived with them ever since they purchased the premises in question; that when they first took possession there was on the premises a garden, flowers and berry trees; that the mortar mixing machine makes an intermittent grinding noise; that when the cars loaded with sand are drawn in by the switch engine the whole building of plaintiffs shakes; that the operation of the derrick and shovel, which begins at 6:30 o'clock in the morning awakens the children and causes them to come downstairs screaming; that lime smoke keeps coming in from the

lime "something terrible, about twice a day in the morning—mostly in the afternoon"; that defendant's factory has two chimneys which, when mortar is being mixed, emit "terrible black smoke," and the smoke comes into the plaintiffs' building; that when they retire at night the operation of the machinery shakes the beds; that in the daytime they cannot put things on the dresser because of the shaking caused by the operation of the derrick; that the shaking and jarring cracked the building in a couple of places in the bedrooms and dining room; that the cars of loaded sand, coming in, shook and cracked the building; that in the wintertime the "machinery is frozen" and when it starts running "it gives a couple of shots before it goes, and then wakes up the children and everybody"; that the defendant "started making a fire underneath these sand cars with gasoline, the flame of gasoline all night long, and this smoke comes right into the building"; that the defendant in breaking up the sand "throws the shovel right down heavy and it gives such a loud noise, and a shake and you can hear everything"; that there is insufficient space in which to turn the derrick, "the shovel covers over on our property about a foot and our children pass by and get their hair full of sand," and the shovel "hit our building four times," and that the knocking and running of the machinery is causing the front porch to break away from the building.

In describing the effects of the sand, the witness testified that it came into the building "terribly through the least little crack"; that because of the sand they had to clean the windows every day; that when the children get up in the morning "they are simply terrible with sand"; that it "just keeps coming in through the windows and the pressure of the sand also broke windows on that side, and the big pile of sand comes right in"; that the sand was too heavy so

it pushed the iron beams against the building and cracked it in a few places and that "sand is always making the walls damp and the wall is bulging up about a quarter of an inch off the foundation."

The witness further testified that before the preparation of a meal, it becomes necessary to remove the sand from the dishes with a towel; that the sand fills up the gutters "terribly" and that cleaning them twice a year is insufficient to keep them clean; that sand gets into the ice-box and the food, and that it gets on the floors so that in walking over them the varnish was scraped off.

She further testified that "I saw the wall come down and it came right in our yard and broke our cherry tree and all the shrubbery we had around the walk and flowers on it"; that after the wall came down "there was so much bricks that it blocked our whole hall"; that "when there is a wind from the east we cannot walk in that way because the sand is hitting us so there is a regular sand storm, when there is a big wind from the east, we cannot walk through because the wall is now broke down and we cannot walk"; that "we get our eyes full of sand and hair and everything"; that "the children cannot play in the front of the yard at all and that is the only yard they have"; that "the sand blowing has affected the flowers, they won't grow because there is too much sand," and that, "the yard is filled with sand just like snow."

The testimony of this witness was corroborated, in substance, by the testimony of her sister and that of the plaintiffs.

The only material testimony of the witnesses for the defendant, referred to in the brief of counsel for defendant, is to the effect that coal was used in the factory only in the wintertime, for the purpose of heating the plant by means of a low pressure boiler, the firing being done about three times a day; that cold water was used in making the mortar and that although some vapor came from the slacking of the lime, it was moist, had no

odor, and soon dissipated in the air; that no dry dust came from the lime or the slacking of it; that no vibration was produced by the operation of the machinery in the plant and that the noise from the motors could be heard in the building but sounded like the running of an automobile.

The court, at the instance of the plaintiffs, gave five instructions to the jury. Inasmuch as counsel for the defendant contends that the giving of each instruction constituted reversible error, we set them out in full as follows:

"The Court instructs the jury as a matter of law that noise of such character as to produce actual physical discomfort and annoyance to a person of ordinary sensibilities in the enjoyment of his home, is nuisance, even though it is caused by conducting a trade or business in a city, if, indeed, you believe from all the evidence in this case that such were the facts here.

"The Court instructs the jury as a matter of law that if you believe from all the evidence that the defendant maintained a sand pile adjoining the home of the plaintiffs, and that sand from such sand pile, sifted into the home of the plaintiffs and onto the plaintiffs' property there so as to produce actual physical discomfort and annoyance to a person of ordinary sensibilities in the enjoyment of his home, then you are instructed that the maintenance of such sand pile is a nuisance, and the plaintiffs are entitled to recover.

"The Court instructs you as a matter of law that if you find from all the evidence that the acts of the defendant complained of herein by the plaintiffs constituted a nuisance, then you are instructed that in such cases the law does not give entire damages as for a permanent injury to the real estate but allows such damages as for the continuation of the nuisance as accrue up to the date of the bringing of the suit, if indeed you find that there were any such damages from the evidence in this case.

"The Court instructs the jury as a matter of law that if a business as conducted is offensive to such a degree as materially to interfere with the ordinary physical comfort of a neighbor in the enjoyment of his neighboring property, measured not by the standard of persons of delicate sensibilities and fastidious habits but by the habits and feelings of ordinary persons, then such a business is a nuisance notwithstanding the business is a necessary one; and if you find from all of the evidence that the business being conducted by the defendant in this case as it was conducted by it at the times complained of by the plaintiffs herein, was offensive to that degree, if at all, then you are justified in finding that it was a nuisance and in assessing plaintiffs' damages herein.

"The Court instructs the jury as a matter of law that if from the evidence in this case and under the instructions of the Court, you find for the plaintiffs, then you may assess the plaintiffs' damages herein. In assessing the plaintiffs' damages, you may take into consideration the character of plaintiffs' dwelling house, and every other fact appearing in evidence, if any, tending to show the plaintiffs have been deprived of the comfortable use and enjoyment of their home, up to the time of filing suit here on July 16, 1927.''

Particular objection is made to the first instruction on the ground that it directed the jury to consider noise as an element of damages. It is contended that husband and wife cannot maintain a joint action for damages on account of annoyance or personal discomfort caused by noise. In support of this contention the case of *Lindblom v. Purity Ice & Refrigerating Co.,* 217 Ill. App. 306, is cited and quoted from. The pertinent portion of the opinion is as follows:

"All of the evidence introduced by appellees to sustain the first and second counts of the declaration was evidence tending to show that by reason of the noises emanating from the ice plant, appellees and their

family suffered from loss of sleep which made them nervous and ill in health; that Olaf Lindblom used cotton in his ears to prevent the hearing of the noise in an endeavor to sleep, but was compelled to discontinue it on the advice of a physician, because it was affecting his hearing, and evidence tending to show personal annoyance and personal discomfort caused by the noises. This is a joint action brought by Lindblom and his wife and none of this evidence shows or tends to show a joint cause of action. The fact that the grievance of husband and wife are similar does not justify joining them in one action.

" 'When the interests are several, there could as a rule be no joinder, even when the rights of all the plaintiffs have been violated by one and the same wrongful act on the part of the defendant, or had arisen *ex contractu* out of one and the same transaction with defendant.' 30 Cyc. 106; *Tenant v. Pfister,* 51 Cal. 511; *American Plate Glass Co. v. Nicoson,* 34 Ind. App. 643, 73 N. E. 625; *Brunner v. Bay City,* 46 Mich. 236, 9 N. W. 263; *Girard v. Lehigh Stone Co.,* 280 Ill. 485."

The cases cited in the opinion in support of that portion of it, above quoted, have been fully analyzed by counsel for the plaintiffs and, although seeming to support the principle announced, do not directly apply to the case of a nuisance. Apparently, the court proceeded upon the theory that the evidence as to noise was introduced for the purpose of showing personal injury and annoyance to the plaintiffs. The reference to the testimony that the husband used cotton in his ears to prevent his hearing the noise so that he might sleep, and that he was advised by his physician to discontinue the practice because it was affecting his hearing, is strongly indicative that the court had in mind personal injuries and discomforts rather than an interference with the plaintiffs' use and enjoyment of their property.

In the case of *Gempp v. Bassham,* 60 Ill. App. 84, it

was held that, in an action for damages sustained because of a nuisance, it was proper to admit evidence of noises and stenches and other facts to aid the jury in determining whether and to what extent the plaintiff and his family had been deprived "of the wholesome and comfortable use of his home." The court further held that it was error to refuse admission of evidence as to the deleterious effect of the nuisance upon the health of the plaintiff's wife. In so ruling, the court said:

"Under the influence of the same erroneous view of the rule as to the measure of damages and the manner of proof thereof, the court refused to permit the appellant to prove that effluvia from the stables deleteriously affected the health of his wife.

"Proof should have been admitted of any fact which would aid the jury in determining whether and to what extent the plaintiff and his family had been deprived of the wholesome and comfortable use of his home by the stenches, noises, etc., from the stable.

"The effect of such stenches or noises upon any person who might be in plaintiff's house, whether a member of his family or a mere caller, would tend to enlighten the jury upon the question whether his dwelling was rendered physically uncomfortable as a home and was therefore competent to be proven. *Ellis v. Council Bluff R. R.*, 22 Mo. 131; *Loughbram v. Des Moines*, 72 Iowa 382; *Pierce v. Wagner*, 29 Minn. 355.

"It is true the declaration did not aver that odors, etc., from the stable caused illness of plaintiff's wife.

"Such an averment would no doubt have been necessary had plaintiff sought to recover special damages because of the illness of his wife, as for instance, moneys expended for medicines, medical treatment, etc., but was not necessary in order to admit proof that his home was rendered physically uncomfortable and unwholesome by the nuisance created by the appellee."

To the same effect are: *Chicago, M. & St. P. Ry. Co. v. Darke,* 148 Ill. 226; *Munie v. Millner,* 245 Ill. App.

257; *Baltimore & P. R. Co. v. Fifth Baptist Church,* 108 U. S. 317.

Even if there was a misjoinder of parties·plaintiff, the defendant cannot now complain, because it filed the general issue and went to trial without raising the point. *Helmuth v. Bell,* 150 Ill. 263. In that case a widow and her infant children joined in a statutory proceeding against a saloon keeper, to recover damages for loss of support due to the death of the husband and father from intoxication. The Supreme Court expressed a doubt as to whether a joint action would lie, but finally said:

"But if it were otherwise, appellants are in no condition to raise the question now. Each of the parties plaintiff had a right of action against the defendants, of the same nature, growing out of the same wrong, and even though the statute does not authorize a joint suit, the defendants having elected to plead to the action so brought, and suffered a verdict and judgment to go against them, have waived the error."

Counsel for the defendant also complains of plaintiffs' instructions 3, 4 and 5 for the reason that they, in substance, direct the jury to consider noise, smoke and vapor as elements of damage. What we have said with reference to instruction number 1 disposes of this contention.

It is further contended that the giving of plaintiffs' instruction number 2 constituted reversible error because it singled out and directed the attention of the jury to the pile of sand located upon the premises of the defendant. This contention is untenable for the obvious reason that the evidence disclosed the existence of only one pile of sand, and that was situated upon the defendant's property.

It is also urged that plaintiffs' instruction numbered 3 is erroneous for the reason that it directed the jury that it was proper to assess permanent damages, if they found in favor of the plaintiffs. As we construe the instruction, the jury were told, in unequivocal language,

that they had no right to assess "entire damages as for a permanent injury to the real estate" of the plaintiffs.

We have considered the other objections to the instructions and find that they are not well founded in point of law.

There was some testimony received showing that, when the defendant first began the operation of its factory, the children in the plaintiffs' family came down the stairs in the morning crying. This testimony was not prejudicial to the defendant. If the witnesses for the plaintiffs told the truth, it was but natural that the children should cry. Certainly their expression of fear or emotion could not be considered to be of a self-serving nature.

Two of the witnesses for the plaintiffs cried while giving their testimony from the witness stand. Counsel for the defendant made a motion to withdraw a juror. A hearing was had in chambers upon the motion and the trial judge denied it. It was for the trial judge to determine whether the witnesses were giving vent to their natural feelings or whether they were attempting to influence the jury.

Finally, it is said that the damages assessed are excessive. True, the plaintiffs paid only $5,000 for their property, and it was not an ideal residence district. But it was their place of abode, which they selected before the defendant located its factory next door. Perhaps the plaintiffs could not afford a home in the choicest residential section of Chicago. They endured the inconveniences and discomforts occasioned by the operation of the defendant's factory from 1923 until 1927, when they brought their suit. We are not prepared to say that the damages assessed by the jury were excessive.

For the foregoing reasons the judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

WILSON, P. J., and HOLDOM, J., concur.