GORMAN ET UX. *v.* SABO ET UX.

[No. 175, October Term, 1955.]

*Decided May 8, 1956.*

158

The cause was argued before BRUNE, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Henry A. Babcock,* with whom were *Ignatius J. Keane* and *Green & Babcock* on the brief, for the appellants.

*Jerrold V. Powers,* with whom were *Lansdale G. Sasscer, Jr.,* and *Sasscer, Clagett & Powers* on the brief, for the appellees.

HAMMOND, J., delivered the opinion of the Court.

The jury found a verdict of $3,500 against Mr. and Mrs. Gorman, the appellants, in a suit against them by their neighbors, Mr. and Mrs. Sabo, the appellees, based on the wilful, malicious, long-continued beaming into the Sabo home of very loud and highly unreasonable blaring of the Gorman radio, and this appeal is from the judgment on that verdict. We are asked to hold that the demurrer to the declaration should have been sustained, that a directed verdict should have been granted as to Mr. Gorman, that there was no proof of actual damage, (and that testimony that illness of Mrs. Sabo was caused by the nuisance was improperly admitted and not an element of damage), as well as that the court erred in its instruction as to compensatory and punitive damages, and finally, that there was reversible error in the refusal of the court to continue the case during trial when Mrs. Gorman was absent.

The declaration alleged that the Sabos were the owners and occupants of 5422 Macbeth Street, Quincy Manor in Prince George's County and that the Gormans were the owners and occupants of 5420 Macbeth Street, the houses being separated by a relatively narrow open space, and that on or about August 1, 1952, the Gormans "embarked upon an intentional malicious and wilful course of action to annoy, harass

and injure the plaintiffs by causing, permitting, or causing and permitting loud and offensive sounds to emanate from their said property in such a way as to pass over into the plaintiffs' property resulting in serious interference with the ordinary comfort, use and enjoyment by the plaintiffs of their property, and persisted and still persist in continuation of the said course of action after frequent requests to desist." These allegations state a good cause of action. If noise causes physical discomfort and annoyance to those of ordinary sensibilities, tastes and habits and seriously interferes with the ordinary comfort and enjoyment of their homes, and thus diminishes the value of the use of their property rights, it constitutes a private nuisance, entitling those offended against to damages. *Meadowbrook Swimming Club, Inc. v. Albert,* 173 Md. 641; *Dittman v. Repp,* 50 Md. 516; *Singer v. James,* 130 Md. 382; *Green v. Shoemaker & Co.,* 111 Md. 69; *Noise as a Nuisance,* 82 U. of Pa. L. R. 567, 569; 3 Md. L. R. 240; *Restatement, Law of Torts,* Secs. 822-831. *Prosser, Law of Torts*, 2nd Ed., pp. 406, 407, puts it this way: "* * * a disturbance of the comfort or convenience of the occupant, as by * * * loud noises * * *" is a nuisance. He adds: "So long as the interference is substantial and unreasonable, and such as would be offensive or inconvenient to the normal person, virtually any disturbance of the enjoyment of the property may amount to a nuisance." See also *Webb's Pollack on Torts,* 494, *et seq.; 2 Wood on Nuisances,* 3rd Ed., Secs. 611 and 618; *Sutherland on Damages,* 4th Ed., Vol. 4, Sec. 1035, p. 3838. A musical instrument played loud and long enough has been held to be a nuisance comparable to the water torture of the Chinese. *2 Wood on Nuisances, ibid.,* Secs. 618 and 632; *Collier v. Ernst,* 31 Del. County (Pa.) Reports 49; and see *Meadowbrook Swimming Club, Inc. v. Albert, supra.* The demurrer was properly overruled.

There was produced at the trial testimony which would have permitted the jury to find the following facts. The appellees, Mr. and Mrs. Sabo, and their four children moved in next door to Mr. and Mrs. Gorman, the appellants, who also had children. Trouble arose between the children which led to ill feeling on the part of Mrs. Gorman against the Sabo

children, Mrs. Sabo, and eventually, Mr. Sabo. In the late summer or fall of 1952, Mrs. Gorman engaged in a deliberate and calculated effort to harass and annoy the Sabo family with the aim of making them move. She did this by deliberately turning up the radio in the Gorman house to an excessive and highly unreasonable volume, beaming it directly from a west window of the Gorman house into the east side of the Sabo house. This continued for hours each day over a period of several years. The radio was placed on a table in the middle bedroom on the second floor of the Gorman house right at the casement windows, which were opened and angled so that the sound was directed at the Sabo house. Closed was the door of the room in which the radio was so that other neighbors would not be annoyed. The window was kept open even in cold weather when normally the windows would have been closed. Mrs. Gorman also ordered her children to beat with sticks and stones on metal furniture and cans at strategic times to annoy the Sabo children and Mrs. Sabo. Mrs. Gorman's efforts to get rid of the Sabo family were known to the neighbors, many having seen the radio and heard its noise and other noises. Mrs. Gorman told various neighbors that she intended to make the Sabos move, that she would make life miserable for Mrs. Sabo, that she hoped Mr. Sabo would be struck down and never speak, and prayed that she would see Mrs. Sabo lie bleeding on the floor, that the Sabos would wish they were in hell before she was through with them, and on several occasions, with Mr. Gorman present, she said that she intended to see that Mrs. Sabo was carried out of the house either in a strait jacket or in a coffin. Soon after the campaign of noise began, Mr. Sabo asked Mr. Gorman to have his wife stop playing the radio. It continued to be played in the same loud and offensive manner for several years. Mr. Sabo complained to Mr. Gorman some five times about the noise. On one occasion Mr. Gorman turned the radio up loud in response to his wife's statement, " 'Louder, dear, it is not loud enough.' " There was also testimony that when Mr. Gorman came home from work, Mrs. Gorman would tell him how things were going, and on one occasion, said: " 'I did a good job today.' " One of the neighbors testified

that several times he heard Mr. and Mrs. Gorman say "* * * they were purposely playing the radio to annoy the Sabos." Mr. Gorman said that the radio which was played belonged to him. There was testimony that as a result of the noise, life became miserable for Mr. and Mrs. Sabo, that their children could not sleep in the afternoon when they were supposed to take their naps, that it was necessary to move them from their room on the side of the house facing the Gormans and to shut the doors and windows of that room. Neighbors said that on innumerable occasions, too many to count, it was impossible to carry on a conversation in the Sabo home. There was medical testimony that Mrs. Sabo was suffering from an actual illness because of the constant harassment of the noise. Mr. Sabo testified that his wife's deterioration in physical and nervous condition, and the miseries they endured as a result of the Gorman's actions, made him irritable and nervous. Both Mr. and Mrs. Sabo said they had reached the point where they could not control themselves and could no longer stand the conditions to which they were subjected.

We think there was sufficient evidence to support a finding that Mr. Gorman participated in the maintenance and continuance of the nuisance. One who does not create a nuisance may be liable for some active participation in the continuance of it or by the doing of some positive act evidencing its adoption. *Walter v. Wicomico County,* 35 Md. 385. Here the radio that produced the noise belonged to Mr. Gorman and was played in the home he owned and lived in. He was fully aware of the design in playing it, did not stop it when asked to, and on at least one occasion, himself turned it up. He stood silent when his wife said that "they" were purposely annoying the Sabos and when she said on several occasions that she would (by using his property and his home) see Mrs. Sabo carried out either in a strait jacket or a coffin. If Mrs. Gorman's activities constituted a misdemeanor, the evidence would permit a finding that Mr. Gorman was a participant in the crime. *Seward v. State,* 208 Md. 341. The directed verdict properly was denied as to him. There was no motion for a directed verdict by Mrs. Gorman.

The challenges to the proof of compensatory damages, the right to punitive damages, and to the correctness of the charge of the court on both, must fail. There was no exception to the charge on compensatory damages by either Mr. or Mrs. Gorman and, ordinarily, on appeal neither could raise the correctness of the charge in this respect. General Rules of Practice and Procedure, Part III, Rule 6(c) and 6(d); *Ritterpusch v. Lithographic Plate Service,* 208 Md. 592, 601-602. There is no real claim by the appellants that the testimony did not support a finding of wilfulness and malice on the part of Mrs. Gorman sufficient to justify punitive damages. Her failure to seek a directed verdict or to except to the court's charge on either compensatory or punitive damages, leaves her no standing in this Court to challenge the jury's verdict. Mr. Gorman, however, did ask for a directed verdict and did except to the court's charge on punitive damages. The right to compensation, or at least nominal damages, must be established before punitive damages may be awarded, and we think that Mr. Gorman sufficiently preserved his rights on appeal to have us discuss and decide whether the award of compensatory and punitive damages against him was permissible under the evidence. We think the record makes it clear that there was evidence from which the jury properly could have found, as it did, that he must respond in both kinds of damages. Where there is a non-trespassory invasion of rights in real property occupied by the owner as a home, consisting of a temporary private nuisance, the measure of damages is the diminution in the value of the use of the property as a home. The elements to be considered in the loss of the value of the use include the ordinary use and enjoyment of the home, and may also include sickness or ill health of those in the home caused by the nuisance. *Sutherland on Damages,* 4th Ed., Vol. 4, Sec. 1048, p. 3890, says that the law is: "A plaintiff who occupies a home is not limited to the recovery of the diminished rental value of it, but may be compensated for any actual inconvenience and physical discomfort which materially affected the comfortable and healthful enjoyment and occupancy of his home * * *." See also *Wood on Nuisances,* 3rd Ed., Sec. 866; *McCormick*

on Damages, Sec. 127, p. 503. In *Baltimore & Potomac Railroad Co. v. Fifth Baptist Church,* 108 U. S. 317, 27 L. Ed. 739, a roundhouse of the railroad was operated so as to constitute a nuisance to the church next door by reason of noise and dirt. The Supreme Court said: "The plaintiff was entitled to recover because of the inconvenience and discomfort caused to the congregation assembled * * *. The property might not be depreciated in its salable or market value * * *. But, as the court below very properly said to the jury, the congregation had the same right to the comfortable enjoyment of its house for church purposes that a private gentleman has to the comfortable enjoyment of his own house, and it is the discomfort and annoyance in its use for those purposes which is the primary consideration in allowing damages. As with a blow on the face, there may be no arithmetical rule for the estimate of damages. There is, however, an injury, the extent of which the jury may measure." See also *Kentucky West Virginia Gas Co. v. Lafferty,* 174 F. 2d 848; *Riblet v. Spokane-Portland Cement Co.* (Wash.), 274 P. 2d 574, 577, 579; *McCracken v. Swift & Co.* (Mo.), 265 S. W. 91.

The rule of the various states differs in regard to how adverse physical effects caused by nuisances are to be treated. There is an excellent annotation in 142 A. L. R. 1307, which discusses the differences. In many jurisdictions, it is held that damages for illness caused by a nuisance are recoverable in addition to, and separate from, damages for diminution in the value of the use or the value of the rental of the property. In other jurisdictions, the ill health is treated as an element or measure of the extent of the loss of value of the use and of the substantial invasion of normal and comfortable enjoyment of the property, and the illness of a member of the household may be included in the invaded property rights of the head of the house. *U. S. Smelting Co. v. Sisam,* 191 F. 293; *Phillips Petroleum Co. v. Ruble* (Okl.), 126 P. 2d 526; *Millett v. Minnesota Crushed Stone Co.* (Minn.), 177 N. W. 641; *Kempinski v. Tuthill Building Material Co.,* 255 Ill. App. 375. *Sutherland,* work and volume cited, Sec. 1051, p. 3905, says: "The later cases go further and allow the recovery of such sums as will fairly and reasonably compensate for the

bodily sickness, pain and discomfort and annoyance suffered by reason of the nuisance either by the plaintiff or his family * * *." This Court has recognized that recovery may be had for injury to the person from a nuisance. In *Green v. Shoemaker*, 111 Md. 69, *supra*, the plaintiff was allowed to recover damages for the interference with her quiet possession and enjoyment of rooms rented by her and for physical injuries and nervousness from fright, caused by the acts of the defendant that constituted the nuisance. See also *Susquehanna Fertilizer Co. v. Malone*, 73 Md. 268, at 271, 276. We think that the Sabos produced sufficient evidence of the ill effects suffered by them as a result of the nuisance maintained by the Gormans to entitle them to substantial damages under the tests of the cases. As we have noted, if the acts and conduct complained of by the Sabos did amount to an actionable wrong, there was sufficient evidence of Mr. Gorman's participation in it to permit a jury to find that he was liable for both compensatory and punitive damages. There is no doubt that punitive damages may be recovered in the case of a private nuisance. *Superior Construction Co. v. Elmo*, 204 Md. 1; *Sutherland*, work and volume cited, Sec. 1052. The applicable law was correctly put to the jury by the trial court in his charge. He told them the Sabos must prove their case "by a fair preponderance of the evidence" and said that as a matter of law there was no claim for damage to their property nor for any diminution in the value of the property, nor for any claim for physical injury as such, but rather, added the court: "The claim is limited to the question of whether the action of the defendants, or either of them, has resulted in serious interference with the ordinary comfort, use and enjoyment by the plaintiffs of their property. Now, the Court stresses the language 'ordinary comfort, use and enjoyment' and informs you that you must consider what normal, ordinary persons would consider comfort to be, and their reasonable use and enjoyment of their property, and you may not consider that the actions of the defendants, or either of them, may have had some extraordinary adverse effect upon the comfort and use and enjoyment by a person of not ordinary sensitivities." The court, after describing the acts claimed to

constitute the nuisance, went on to say that compensatory damages are such as, in the opinion of the jury, "would fairly compensate the plaintiff or plaintiffs, or either of them, for any diminution or interference with ordinary comfort and use and enjoyment by the plaintiffs of their property." We think that the charge instructed the jury as to the law and the damages that might properly be recovered with as much definiteness as can be expected in this type of case. *Baltimore & Potomac Railroad Co. v. Fifth Baptist Church, supra; Gavigan v. Atlantic Refining Co.,* 186 Pa. 604, 613, 40 A. 834; *Farver v. Amer. Car & Fdry. Co.,* 24 Pa. Sup. Ct. 579. In the *Gavigan* case, there had been a non-trespassory invasion of rights in property occupied by the owner, and the lower court had told the jury that in considering whether there had been injury to the reasonable use of the property and to health and physical comfort, the jury must find an actual, substantial injury and that if they did, they must use their best judgment and soundest discretion in deciding to what plaintiff was entitled. The appellate court affirmed. It said: "* * * owing to the peculiar nature of the injury here complained of, we do not well see that the instruction could have been more specific", and analogized the damages sought with those for pain and suffering from negligence. We think that here the Court's removal from the case, as a matter of law, of recovery for damage to and loss in value of property as such, and for physical injury as such, and the emphasis on the need for substantial and actual injury, taken in connection with the language of the charge as to what normal and ordinary persons would consider a comfortable and reasonable use and enjoyment of property, make the charge a fair and proper one not subject to the infirmities and limitations heretofore noted by this Court in *Susquehanna Fertilizer Co. v. Malone,* 73 Md. 268, 271, *supra; Susquehanna Fertilizer Co. v. Spangler,* 86 Md. 562; *Euler v. Sullivan,* 75 Md. 616, 619; *Carroll Springs Co. v. Schnepfe,* 111 Md. 420; and *Baltimore Belt R. R. Co. v. Sattler,* 102 Md. 595, 605. In the case last cited, the clear implication of the opinion is that if the prayer, there found defective as too general, had limited the jury to the award of damages "for the interference to the reasonable

and comfortable enjoyment of his property caused by the defendants * * *," it would have been a proper prayer. Since here the jury properly could have found compensatory damages against both appellants under instructions correctly stating the applicable law, a finding of punitive damages was clearly warranted against both appellants. The court's instructions as to punitive damages stated the law accurately.

It is urged that there was an abuse of discretion amounting to reversible error in the refusal of the trial court to postpone the further trial of the case on the afternoon of the first day when Mrs. Gorman was unable to be present, and on the next morning when again she was not present. The appellants, in their reply brief, presented an affidavit by trial counsel for appellants (who did not appear on appeal) that the trial judge refused to take the case out of the assignment although he was shown a certificate from a doctor to the effect that it would be better if the case could be postponed, that Mrs. Gorman became ill during the noon recess of the first day of the trial, that a doctor was summoned and gave her a hypodermic, that she was taken to the Prince George's County Hospital, where an interne wrote a certificate saying that she was confused and that excitement might lead to another convulsive episode, and that in spite of these facts, the trial court would not postpone the case either on the afternoon of the first day or on the morning of the second day. The appellees counter by saying that they had been advised before trial that Mrs. Gorman was stating in the neighborhood that she would feign illness to prevent the case from coming to trial and, if necessary, to prevent its conclusion if it did begin and had so told her counsel. They say Mrs. Gorman went home from the hospital and was not ill. The record shows only that about three o'clock on the first day of the trial, Mrs. Gorman's counsel asked that the case be continued until his client "recovers sufficiently to go through the ordeal of a trial". The court denied the motion, stating that counsel should take notes of any testimony that Mrs. Gorman might rebut or explain so that she could testify later, if it were so desired. An exception was taken to this action. When court reconvened the next morning, counsel advised the court briefly that Mrs.

Gorman was not able to be present and renewed the request for a continuance, and the court denied the request and granted an exception. It is not claimed in the brief, nor was it at the argument, that the appellants were hurt in fact by the failure of the court to allow a continuance of the case. It is not even claimed that Mrs. Gorman had planned to take the stand or that she would have been a helpful or persuasive witness. It is not said that she would testify as to any fact that was not brought out in the trial, or that she could have aided in bringing out any fact not brought out either on direct or cross examination of any witness. No actual prejudice was claimed, much less shown. The right of a party to a cause to be present throughout the trial is not an absolute right in a civil case and in the discretion of the court, with due regard to the circumstances as to prejudice, the case may be tried or finished when a party, including a defendant, is absent. *Winakur v. Zeno,* 169 Md. 698, unreported, 181 A. 224; *Mead v. Tydings,* 133 Md. 608, 612; *Speers Sand & Clay Works v. Amer. Trust Co.,* C. A. 4, 52 F. 2d 831; 12 Am. Jur., *Continuances,* Secs. 14 and 15; and 17 C. J. S., *Continuances,* Sec. 29. We cannot say from the record—and we do not mean to imply that if all the facts attempted to be presented by both sides were in the record that our decision would be otherwise—that the action of the trial court was not in his sound discretion and without prejudice to the appellants. In *Jones v. Little,* Sup. Ct. of Pa., 2 Dallas 182, 1 L. Ed. 340, in the face of a certificate from a physician stating that the defendant had been dangerously ill for three weeks, the court refused to put off the trial, Justice Shippen saying: "If there had been an affidavit stating, that there were material witnesses, who had not been summoned in consequence of this sickness; or if the plaintiff himself were a witness, to prove books or the like; that might have weight with the court; but, as it is, the trial must proceed." On the facts, the case before us differs essentially from *Plank v. Summers,* 205 Md. 598, for there the refusal to continue the trial in effect put the appellant out of court by depriving him of the chance to prove his case.

*Judgment affirmed, with costs.*