858 A.2d 1018

**William Bruce ECHARD**

v.

**Richard KRAFT, et al.**

**No. 490, Sept. Term 2003.**

Court of Special Appeals of Maryland.

Oct. 1, 2004.

Gregory J. Swain, Annapolis, for Appellant.

S. Kennon Scott, Annapolis, for Appellee.

Panel: HOLLANDER, SALMON, and RAYMOND G. THIEME, Jr. (Ret., Specially Assigned), JJ.

SALMON, Judge.

In "Mending Wall," Robert Frost quotes his neighbor as having said, "Good fences make good neighbors." Frost, however, knew that this was not always true, *viz:*

> If I could put a notion in his head: *"Why* do they make good neighbors? Isn't it Where there are cows? But here there

are no cows. Before I'd build a wall I'd ask to know What I was walling in or walling out, And to whom I was like to give offense."

The case that gives rise to this appeal had its origin when one neighbor built a fence, which, to put it mildly, caused great offense. The fence was so offensive to appellant, William Echard ("Echard"), that it led him to engage in acts of rude behavior toward his neighbors, Richard and Karen Kraft, appellees. Echard's behavior led the Krafts to file a common law nuisance claim against him. The sole issue to be decided in this appeal is whether Echard's unneighborly acts, either taken individually or collectively, constituted a common law nuisance under Maryland law. We shall hold that they did not.

## I.  BACKGROUND FACTS

Mary Katherine Echard, Echard's mother, owns a house situated on a small parcel of land located at 70 Southgate Avenue in Annapolis. Mrs. Echard and her son have lived at that location for many years. And, at all times here relevant, the appellees, Richard and Karen Kraft, lived next door.

Both Mrs. Echard's lot and the Krafts' lot are forty feet wide. The two houses are fifteen to twenty feet apart. Despite the close proximity of their homes, Echard and the Krafts enjoyed an amicable relationship up until March 2001, when Echard and his mother learned that the Krafts were going to build a fence along their common property line. The Krafts' proposed fence greatly angered Mrs. Echard and her son because both believed that the fence would interfere with Mrs. Echard's ability to use her driveway.

Mrs. Echard took legal action on March 5, 2001, in an attempt to have the city revoke the Krafts' fence permit. That action was unsuccessful, and the fence was built that same spring.

On February 26, 2002, Echard sued the Krafts in the Circuit Court for Anne Arundel County. He alleged that the Krafts had defamed him when they made statements to the

Annapolis police concerning his words and actions after he learned where the fence was to be built. The Krafts filed a counterclaim against Echard, in which they alleged, *inter alia*, that Echard had interfered with the peaceful possession of their property.

The matter was tried before a jury. At the conclusion of the entire case, Echard, *pro se*, made a motion for judgment on the nuisance count. He maintained that the Krafts had failed to prove that he had created a nuisance. The trial judge denied Echard's motion. The jury returned a verdict against Echard on his defamation claim and found in favor of the Krafts on their nuisance claim. The jury awarded the Krafts $25,000 in damages. Echard filed an unsuccessful motion for new trial and then a timely appeal to this court.

## II.

To decide the issue of whether the Krafts presented sufficient evidence to allow the jury to consider the common law nuisance claim, we shall focus, as the parties have done, on six separate incidents in which Echard's conduct was either rude or annoying, or both. The evidence will be set forth in the light most favorable to the Krafts, the parties who successfully opposed Echard's motion for judgment. Md. Rule 2–519(b). *See also Pahanish v. Western Trails, Inc.*, 69 Md.App. 342, 353, 517 A.2d 1122 (1986).

### A. *The March 5, 2001, Incident*

Echard found out on March 5, 2001, where the Krafts planned to build their fence. He was infuriated and immediately phoned Richard Kraft and asked him to come to his house so that they could discuss the issue. Mr. Kraft accommodated Echard by paying a visit. The visit was unpleasant. At one point, Echard inquired of his guest, "What kind of an asshole would do this?" He also insulted Mr. Kraft by calling him an "MF." Then, as Mr. Kraft was leaving, Echard warned: "You'd better not build that fence." He then said, "Or, better yet, go ahead [and build the fence]. The more damages, the better."

## B. *Echard's Springtime Trespass*

The Krafts built their fence on the common property line between the Kraft and the Echard premises sometime during the spring of 2001. One day, when the fence was under construction—the date is not revealed in the record—Mrs. Kraft looked out her window and saw Echard on her property, talking to the workmen who were erecting the fence. Mrs. Kraft approached Echard and asked him to leave her yard and stop talking to the workmen. Echard "waived his hands at" Mrs. Kraft and said "that he needed to speak to the men that were erecting the fence." He also told Mrs. Kraft that what he said to the workmen was none of her business.

Appellant did not leave when he was told to do so, which caused Mrs. Kraft to approach Echard once more. She again asked him to leave her property and told him that if he needed to speak to her about the fence, he should come to the front door and "ask to speak to me." She also told Echard not to come in her backyard again without permission and not to speak to the workmen. Echard then reiterated that what he had to say to the workers "was none of [her] business" and continued to talk to the workmen. Eventually, he left the Kraft property without incident.

## C. *Echard's Confrontation with the Krafts' Housekeeper*

One day, again the exact date is not shown in the record, the Krafts' part-time housekeeper went outside to empty a small hand-held "Dust Buster." The housekeeper was banging the dust sack on a railing in order to empty it when Echard, who was standing on his property, waived his hands at the housekeeper and "yelled at her that she shouldn't be putting garbage and dust on his property." Echard's actions greatly upset the housekeeper, according to Mrs. Kraft's testimony.

## D. *Echard's Display of the Universal Sign of Disrespect*

After the fence was erected, Echard and Mr. Kraft were walking out of their houses at the same time. Once again, the exact date is not shown in the record. After the two ex-

changed stares, Mr. Kraft gave a neighborly wave to Echard. He did this because he "didn't know really how he [Echard] was reacting to us any longer." He soon found out, because, in reply to the friendly wave, Echard gave what Mr. Kraft referred to as a "very emphatic finger." Mr. Kraft then walked back into his home.

### E. *Echard's Nighttime Shouts*

The Krafts sleep in a bedroom at the back of their dwelling, i.e., the side farthest from Southgate Avenue. On May 1, 2001, at approximately midnight, Mr. Kraft heard a noise at the front of his house. He got out of bed to investigate, went to the front of his residence, and looked out the window and saw Echard standing on the sidewalk staring at him. Echard next motioned with his arms, then shouted, "Come down here, come down here." Mr. Kraft responded by drawing down the window shade and returning to his bedroom. He then waited "to see if anything was going to happen." When nothing did happen, Mr. Kraft returned to the front of the house, looked out, and saw that Echard was no longer there.

### F. *Echard's Daytime Shouts*

On another unspecified date, Mr. Kraft was having some work done on his house and was standing near a window looking outside when he saw Echard standing in his (Echard's) yard. Echard looked at Mr. Kraft and yelled, "What the hell are you looking at?" Echard next yelled, "Come down here, come down here." Mr. Kraft turned and walked away from his angry neighbor, but as he retreated, he heard Echard say, "Just let me see you somewhere."

### III. *ANALYSIS*

Section 821D of the Restatement (Second) of Torts (1979) defines a private nuisance as "a nontrespassory invasion of another's interest in the private use and enjoyment of land." That definition has been adopted by the Maryland Court of Appeals. *See Rosenblatt v. Exxon Company,* 335 Md. 58, 80, 642 A.2d 180 (1994). Nevertheless, "[n]ot every interference

with the use and enjoyment of land constitutes an actionable nuisance," inasmuch as the interference must be both substantial and unreasonable. *Washington Suburban Sanitary Commission v. CAE–Link Corporation,* 330 Md. 115, 125, 622 A.2d 745 (1993). "To be actionable '[t]he injury must be of such a character as to diminish materially the value of the property as a dwelling [or for the purpose] and seriously interfere with the ordinary comfort and enjoyment of it.' " *Id.* at 143, 622 A.2d 745 (citing *Slaird v. Klewers,* 260 Md. 2, 9, 271 A.2d 345 (1970)) (citing for additional support *Stottlemyer v. Crampton,* 235 Md. 138, 143–44, 200 A.2d 644 (1964); *Bishop Processing Company v. Davis,* 213 Md. 465, 472–74, 132 A.2d 445 (1957); *Gorman v. Sabo,* 210 Md. 155, 162–64, 122 A.2d 475 (1956); *Five Oaks Corporation v. Gathmann,* 190 Md. 348, 352–53, 58 A.2d 656 (1948); *Meadowbrook Swimming Club, Inc. v. Albert,* 173 Md. 641, 645, 197 A. 146 (1938)).

In *WSSC v. CAE–Link Corp.,* the Court said that the foregoing standard could be understood by providing examples. 330 Md. at 144, 622 A.2d 745. One of the examples given was from the case of *Bishop Processing Company v. Davis,* 213 Md. 465, 132 A.2d 445 (1957). The Court in *WSSC v. CAE–Link Corp.* said:

Bishop's [sic] *Processing Company* involved a suit perpetually to enjoin the operator of a processing plant from maintaining and operating the plant so that the odors emanating from the plant interfered with the rightful use and enjoyment by the plaintiffs of their properties in the area. The evidence showed that the plaintiffs resided between one-half to one mile of the plant and that

the process used by the Company in manufacturing its products, when not curbed, produces a shocking and nauseating stench and odor which permeates the surrounding atmosphere for more than a mile and that the stench is so bad that even though the doors and windows of the homes of persons living in the neighborhood surrounding the plant are closed, it comes into the homes causing throat irritations, severe headaches, loss of appetite, nausea, regurgitation and in other ways interferes

with the comfortable enjoyment of their homes by the appellees in this proceeding. The appellees complained particularly of terrific, indescribable unwholesome effluvia that came from the plant and which varied only with the change of the direction of the wind, and stated that while there was relief when the wind blew the odor away from a particular location it was continuous during the operation of the plant in that it followed the wind and caused discomfort in another location in the direction from the plant in which the wind was blowing.

213 Md. at 470, 132 A.2d at 447. The Court rejected the argument that the evidence was insufficient to establish that, had they sued at law, the plaintiffs would have been entitled to substantial damages. Applying the test set out above, it held that the plaintiffs had shown sufficient discomfort and injury to their properties to entitle them to injunctive relief. The Court said:

[T]he evidence justified a finding that the odors complained of caused physical discomfort and annoyance to those of ordinary taste, sensibilities and habits; and that the injury to the appellees' properties was of such a character as to diminish materially their value as dwellings, and to interfere seriously with the ordinary comfort and enjoyment thereof. This clearly brings the appellees within the above quoted and cited decisions of this Court so as to be entitled to relief.

213 Md. at 474, 132 A.2d at 449.

*Id.* at 144–45, 622 A.2d 745.

Maryland's rule (that to be actionable the interference must materially diminish the value of the property as a dwelling *and* seriously interfere with the occupier's use and enjoyment of it) is in accord with the rule set forth in section 821F, Restatement (Second) of Torts (1979), which provides: "There is liability for a nuisance only to those to whom it causes significant harm, of a kind that would be suffered by a normal person in the community or by property in normal condition and use for a normal purpose."

■ Because significant harm is necessary to establish liability for a private nuisance, the authorities are in agreement that for there to be a nuisance there must be a "continuousness or recurrence of the things, facts, or acts, which constitute the nuisance." *See, e.g., United States v. Cohen,* 268 F. 420, 422 (E.D.Mo.1920). *See also Reese v. Wells,* 73 A.2d 899 (D.C.App.1950). The authorities appear to be in agreement that "one act of misconduct, though it causes discomfiture or inconvenience to others in the use and enjoyment of property, is not actionable as a nuisance." *Id.*

Cases from Maryland's sister jurisdictions demonstrate that the kinds of activities that can be targeted by neighboring landowners as private nuisances are things such as "polluting smokestacks, corroded tanks leaking hazardous waste into the groundwater, barking dogs, noisy trains, and smelly hog farms." *See* JOHN NAGLE, MORAL NUISANCES, 50 Emory Law Journal 265 (2001). *See also* Tracy A. Bateman, J.D., Annotation, *Nuisance as entitling owner or occupant of real estate to recover damages for personal inconvenience, discomfort, annoyance, anguish, or sickness, distinct from, or in addition to, damages for depreciation in value of property for its use,* 25 A.L.R. 5th 568, 572–78 (1994). There are cases, however, illustrated by *Gorman v. Sabo, supra,* in which recovery is allowed by willful, malicious, long continuing harassment by the defendant in beaming into the plaintiff's home loud, blaring radio sounds.

The *Gorman* Court said:

If noise causes physical discomfort and annoyance of persons of ordinary sensibilities, tastes and habits and seriously interferes with the ordinary comfort and enjoyment of their homes, and thus diminishes the value of the use of their property rights, it constitutes a private nuisance, entitling those offended against to damages.

210 Md. at 159, 122 A.2d 475 (citations omitted).

The measure of damages in the *Gorman* case was the diminution of value of the use of the property as a home. In arriving at that value, the elements to be considered included

recompense for sickness or ill health of those in the home caused by the nuisance. *Id.* at 162, 122 A.2d 475.

Applying the principles set forth above, we shall examine the six actions about which the Krafts complain to see which, if any, of appellant's actions were proven to be a nuisance. Two of those incidents, on their face, plainly do not constitute a nuisance. As to the remainder, appellees failed to prove "injury of such a character as to diminish materially the value" of the Kraft property as a dwelling *and* to have substantially interfered with the Krafts' use of their land. *WSSC v. CAE–Link Corp.,* 330 Md. at 125, 622 A.2d 745.

■ The March 5, 2001, incident took place in Echard's home. The curse words directed at Mr. Kraft by Echard undoubtedly were offensive to Mr. Kraft's sensibilities. But, Echard's rude words in no way interfered with the Krafts' use of their property, nor did Echard's words in any way diminish the value of the Krafts' property. The offensive words did not constitute a private nuisance.

■ The Krafts proved that on a single occasion, Echard stayed on their property after he was requested to remove himself. Echard's action may well have constituted the tort of trespass. His trespass did not, however, constitute a nuisance. To be a nuisance the interference, by definition, must be "nontrespassory." *Rosenblatt, supra,* 335 Md. at 80, 642 A.2d 180.

■ When Echard hollered at the Krafts' housekeeper while she emptied a dust sack, his shouted words likewise did not constitute an actionable nuisance. Obviously, his actions neither diminished materially the value of the Kraft property as a dwelling nor seriously interfered with the ordinary comfort and enjoyment of the Krafts' land.

■ Echard committed no tort when he showed his contempt for Mr. Kraft by greeting him with a raised middle finger. The law does not concern itself with trifles. *See Restatement (Second) of Torts,* section 821F (Comment *c*). In 21st century America, if giving a rude gesture of this sort

were actionable, an avalanche of frivolous litigation would result.

■ This leaves us with the two incidents in which Echard, while standing on his own property, shouted a challenge to Mr. Kraft to "come on down," which was interpreted by Mr. Kraft as an invitation to fight. Mr. Kraft declined the invitation to fight, and during the approximately two-year period that intervened between the March 5, 2001, incident and the time of the trial of this matter, Echard never physically touched either Mr. Kraft or his wife, nor did he ever damage any of their real or personal property. In the two shouting incidences, Echard uttered a total of about a dozen words. Annoying though his words may have been, the noise emitted is a far cry from the type of constant harassing activity that is actionable. *See, e.g., Gorman, supra*, 210 Md. at 162–64, 122 A.2d 475, where the long-continuing beaming of loud, blaring music from defendant's radio into the plaintiff's home constituted a nuisance.

In support of their contention that Echard's action constituted a nuisance, the appellees look at Echard's six actions collectively, not individually. Appellees' approach is unsatisfactory because it is impossible to tell what action or actions of Echard's caused what reactions. This is important in light of the fact that some of Echard's actions about which the Krafts complain would not constitute a nuisance even if Echard repeated such actions twenty times a day every day, e.g., giving Mr. Kraft "the finger."

■ In an effort to prove a significant interference with their right to use their property freely, the Krafts relied in large part on the testimony of Mrs. Kraft. Although Echard dealt with Mrs. Kraft only once (the trespass incident), she testified that her housekeeper told her what happened when she was emptying her dust sack and her husband told her what had happened on the other occasions. According to Mrs. Kraft, news of Echard's actions were "extremely stressful emotionally ... [and] physically" to her. She testified that she could not sleep at night and that Echard's lawsuit against

her and her husband had stressed them financially. In her words, "You don't know what's going to happen next. You don't know what lawsuit is going to come to the door, and you don't know when it's going to stop." Also, according to Mrs. Kraft, Echard's actions made her reluctant to go outside because she wanted "to avoid any possible altercation or situation." Obviously, however, even if we knew that the actions complained about constituted "nontrespassory invasion[s]," testimony of this sort does not help prove that the value of their property as a dwelling was reduced.

Mr. Kraft corroborated his wife's testimony that he and his wife avoided going into their yard "when Echard was expected to be around." Similarly, according to Mr. Kraft, when he or his wife see Echard going into or out of his house, they try to stay out of their yard because they fear him.

According to appellees, the six incidents discussed above, coupled with their testimony concerning how they reacted to Echard's rude deportment, were sufficient to prove a private nuisance. But, Echard never physically prevented the Krafts from using their yard. According to the evidence, they avoided using their own yard simply as a method of avoiding Echard because he had been rude to them. This avoidance policy was one of free. choice. If they had used their yard (according to their proof), they would have risked nothing more than having to endure rude gestures or words from their neighbor. In sum, proof that they adopted such an avoidance policy was insufficient to prove either of the two necessary elements of a private nuisance action, i.e., (1) their injury was of such "a character as to diminish materially the value of the property for" use as a dwelling *and* (2) Echard's actions caused "serious interference with the ordinary comfort and enjoyment" of the Krafts' property. *Slaird*, 260 Md. at 9, 271 A.2d 345.

**JUDGMENT AS TO THE COUNTERCLAIM ENTERED IN FAVOR OF RICHARD AND KAREN KRAFT REVERSED; COSTS TO BE PAID BY APPELLEES.**