516 A.2d 990

EXXON CORPORATION

v.

John YAREMA, et al.

No. 143, Sept. Term, 1986.

Court of Special Appeals of Maryland.

Nov. 6, 1986.

Certiorari Denied March 23, 1987.

Lewis A. Noonberg (Jeffrey D. Herschman, John E. Griffith, Jr. and Piper & Marbury, Baltimore, on the brief; Richard P. Delaney and Mark A. Howard, Houston, Tex., of counsel), for appellant.

Brian C. Parker (James A. Smith and Gebhardt & Smith on the brief), Baltimore, for appellees, The Yaremas.

J. Earle Plumhoff (Robert L. Hanley, Jr. and Nolan, Plumhoff & Williams, Chartered on the brief), Towson, for appellees, Ascot Estates, Inc. & Manor Associates.

Michael I. Gilbert, Baltimore, on the brief for appellees, S & S Land Co. and S & S Development Co.

Argued Before MOYLAN, WEANT and BISHOP, JJ.

BISHOP, Judge.

### TABLE OF CONTENTS

| | Page |
|---|---|
| I. Facts | 132 |
| II. Effect of Settlement on Punitive Damages Award | 133 |
| A. Scope of Uniform Contribution Among Tortfeasors Act | 134 |
| B. Punitive Damages Contingent on Compensatory Award | 138 |
| III. Improper Communication With Jury | 141 |

**130**

| | | Page |
|---|---|---|
| IV. | Physical Impact as Condition Precedent | 145 |
| | A. Nuisance | 146 |
| | B. Negligence and Strict Liabilty | 153 |
| V. | Punitive Damages | 156 |
| | A. The Standard | 156 |
| | B. The Evidence | 158 |
| | C. Conduct Directed Against Particular Plaintiffs. | 167 |
| VI. | Admissibility of Testimony Concerning the Hazardous Effects of Contaminated Water | 169 |

In Jacksonville, Maryland, gasoline leaks developed in storage tanks located at three stations owned respectively by Amoco Oil Company, Gulf Oil Corporation and appellant, Exxon Corporation. The discharged gasoline contaminated the ground water along Jarrettsville Pike and spawned four separate tort suits that involved twenty-seven parties and at least ninety claims. Eventually these cases were consolidated and most claims were settled or dismissed. At the time the trial began, on October 3, 1983, only appellees here, Yarema's Lake, Inc., John E. Yarema, Jr. and Sherrill Yarema (collectively referred to as the "Yaremas"), S & S Land Company and S & S Development Company (collectively "S & S"), Ascot Estates, Inc. and Manor Associates still asserted claims against just two defendants, appellant, Exxon Corporation and its dealer, Patrick Storto. Each plaintiff based recovery upon strict liability, negligence, trespass and nuisance. The trespass actions of the Yaremas and S & S were dismissed on summary judgment by the trial court.

After seven weeks of trial, the jury returned a verdict for Exxon's dealer, Patrick Storto, but found appellant, Exxon Corporation, liable as to every claim except for Manor Associates' nuisance claim. After an untimely appeal was finally resolved in *Yarema v. Exxon Corporation*, 305 Md.

219, 503 A.2d 239 (1986), all cases were remanded to the trial court for disposition of certain open claims.

Because the Yaremas and S & S had previously received settlements from Amoco, Gulf and their dealers which exceeded the total amounts of compensatory and punitive damages awarded by the jury, Exxon moved to strike the judgments against it. The trial court ordered the compensatory awards to be "deemed satisfied" to reflect these payments; however, the court permitted the awards of punitive damages to stand.

The resulting awards against Exxon were:

| Plaintiff | Compensatory Damages Judgment [1] | Punitive Damages Judgment |
|---|---|---|
| Yarema' Lake | – | $ 20,000.00 |
| Mr. & Mrs. Yarema | – | $ 20,000.00 |
| S&S | – | $ 25,000.00 |
| Ascot | $140,000.00 | $910,000.00 |
| Manor | $ 20,000.00 | $ 25,000.00 |

Exxon asks whether the trial court erred:

I. By allowing punitive damages in favor of S & S and the Yaremas, even though these plaintiffs received settlements greater than the jury's total award of both compensatory and punitive damages;

II. When it communicated with the jury out of presence of counsel when discussing the verdict sheet;

III. In denying Exxon's Motions for Judgment as to the plaintiffs whose properties Exxon did not contaminate;

IV. In its rulings as to the standard required for an award of punitive damages; and

V. In allowing testimony concerning the hazardous effects of using contaminated water.

---

**1.** As we will explain, *infra,* the trial court did strike the compensatory damages awards in the first three cases listed above.

## I.

## FACTS

When Exxon built its service station in 1965, it installed three new, carbon steel, underground storage tanks. In March 1979, the operator of the station notified Exxon that the tank which contained premium, unleaded gasoline was losing a significant quantity of gasoline. In response, Exxon evacuated and repaired the corroded tank. Although Exxon knew at the time that at least 1,100 gallons of gasoline had been lost from its tank, it took no immediate remedial measures to recover the gasoline or to prevent the spread of ground water contamination.

Based on inventory shortages amounting to at least 703 gallons, which occurred throughout October and early November 1980, the Exxon operator suspected a second leak, this time in the regular unleaded gasoline storage tank. Although Exxon subsequently contended that this shortfall could have been explained as a "bookkeeping error," it drained and repaired the tank on November 4, 1980. Exxon took no other remedial action at that time.

The following year, in May 1981, Baltimore County became aware of the contamination of the ground water in the Jacksonville area after tests revealed benzene, toluene and xylene in several wells. These toxic chemicals are organic hydrocarbons usually found together in gasoline. Subsequent tests by Exxon indicated the extent to which the ground water contamination had spread to neighboring properties, a fact that Exxon concedes. Because they are not proximately located to the Exxon station, it is uncontroverted that S & S's property and Ascot's office building lot were not contaminated by Exxon leaks. In contrast, tests by Exxon demonstrated conclusively that Exxon's contamination has spread to five of thirteen building lots owned by Ascot as well as the extreme western portion of the Manor Shopping Center property.

With regard to property owned by Yaremas, the issue of contamination remains in dispute. Expert testimony indicated that the Yaremas' property sits on a geological ridge,

which protects it from contamination originating from the Exxon station. Evidence that Yaremas' property was contaminated, however, was adduced during trial. In October of 1981, the Baltimore County Health Department notified John Yarema that his well water was contaminated. In addition, testimony by a representative of the Baltimore County Health Department as well as the Yaremas' expert witness corroborated the fact of contamination.

Regardless of whether actual contamination had spread to neighboring lands, the Baltimore County Health Department imposed severe land use restrictions, including prohibiting the use of well water and banning the sale of the lots or issuance of building permits for all lots that evidenced contamination or were contiguous to such contaminated lots. Obviously these restrictions were imposed because of the potential and imminent threat that Exxon's ground water contamination posed to the people in the Jacksonville area. There was uncontroverted expert testimony from both sides that the flow of ground water can be directed and accelerated when ground water is pumped from a well. Specifically, the pumping of ground water creates a "cone of depression," which in effect draws the contaminated waters towards the well. Consequently, the normal use of wells increases the danger that uncontaminated well water will soon become contaminated. Moreover, Exxon's evidence demonstrates that the threat of contamination spreading to neighboring property is substantial. At the time of trial, Exxon's own evidence demonstrated that its ground water contamination is not receding, but in fact spreading.

In their suits, appellees sought compensatory and punitive damages resulting from Exxon's alleged tortious interference with the use and enjoyment of their properties.

## II.

### Effect of Settlement on Award of Punitive Damages

Before the jury rendered verdicts in their favor, the Yaremas and S & S received substantial amounts from

other defendants, which were at least as great as the subsequent total verdicts, including both compensatory and punitive damages. Pursuant to the Uniform Contribution Among Tortfeasors Act, Maryland Ann.Code art. 50, § 19 (1979), the trial court ordered that the award for compensatory damages be deemed satisfied.[2]

Appellant Exxon argues, on two grounds, that the court erred by permitting the awards for punitive damages to stand. First, Exxon asserts that section 19 of the Uniform Contribution Among Tortfeasors Act should be extended to include punitive damage awards. Exxon argues that since the settlement amounts the Yaremas and S & S received were at least as great as their total awards for compensatory and punitive damages, the punitive damage awards should be reduced to zero. Second, Exxon contends that the award of punitive damages is contingent upon entitlement to compensatory damages. Since the court determined that the Yaremas' and S & S's compensatory damages awards were satisfied fully by their settlements, no recovery of punitive damages is possible. On both points we find Exxon's arguments unpersuasive.

## A.

*Scope of Uniform Contribution Among Tortfeasors Act*

■ Citing *Martinez v. Lopez*, 300 Md. 91, 476 A.2d 197 (1984), Exxon argues that the Uniform Contribution Among Tortfeasors Act requires that the settlements of Exxon's co-defendants should reduce the punitive damage awards to zero. Section 19 of the Act provides:

A release by the injured person of one joint tort feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides; but reduces the claim against the other tort-feasors in the

---

**2.** The issue whether the releases qualified as joint tortfeasors releases for the purposes of the Act was not disputed and the releases themselves were never admitted as part of the record in the trial court. That issue is not before us.

amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

Md.Ann.Code art. 50, § 19 (1979). The Act contains the following definition:

*"Joint tort-feasors"* means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them.

Exxon's argument rests upon the assumption that the Act applies to punitive damages as well as compensatory judgment awards. Neither the Court's decision in *Martinez* nor the purpose of the Act, however, warrant such an assumption.

In *Martinez*, a medical malpractice action, plaintiffs settled with one tortfeasor. After settlement, the jury returned a verdict against the remaining defendant in compensatory damages only, the amount of which was substantially less than the amount of settlement. Applying the Uniform Contribution Among Tortfeasors Act, the Court held that the amount paid by the settling defendant under a pro rata release generally operates to reduce the total claim. Since the consideration paid in settlement exceeded the total claim as valued by the jury, "the trial court should have granted Martinez's motion for the entry of a credit satisfying judgment against him." 300 Md. at 96, 476 A.2d 197.

From our reading of *Martinez*, the Court merely ruled that a prior settlement in an amount exceeding the subsequent compensatory damages jury award extinguished the plaintiff's entitlement to payment under that award. Since the issue of punitive damages was not before the Court in *Martinez*, that case provides us with no authority to extend the scope of the Act beyond compensatory damages.

To determine whether the Uniform Contribution Among Tortfeasors Act applies to punitive as well as compensatory

damages, we must examine the purposes of the Act and, in this context, the inherently different functions that punitive and compensatory damages serve. While section 19 of the Act is silent as to its scope, the Commissioners' Prefatory Note to the 1939 model act provides:

> The desire for equal or proportionate distribution of a common burden among those upon whom it rests is everywhere fundamental. And if one of those subject to the burden discharges the obligation resting on all its natural [sic] that this claim for contribution to the discharge of this common liability be recognized....
>
> It is apparent that an injury resulting from the joint tort of two or more persons involves each of them, jointly and severally, in liability for the entire damage. It is equally apparent that this is an instance of a common obligation resting on two or more, the discharge of which by one of them accrues to the advantage of the others. At first blush, this appears to be a typical instance of the discharge of a common liability to be governed by the principle of contribution. But the policy of Anglo-American common law has been to deny assistance to tort-feasors on the understanding that they are wrongdoers and hence not deserving of the aid of courts in achieving equal or proportionate distribution of the common burden.

From this note, we conclude that the drafters intended section 19 to deal with the common liability of two or more joint tortfeasors and not with the unique liability of an individual wrongdoer.

Common liability obviously means that liability based on defendants' actions and for which they are jointly and severally responsible for injuries suffered by the plaintiff. Section 19 prevents the plaintiff from collecting twice from the same injury caused by multiple defendants while, at the same time, gives credit to a defendant for payment made to the plaintiff. Accordingly, the amount paid under the release of one joint tortfeasor reduces, by that amount, the compensatory damages claimed against other joint tort-

feasors.[3] Where the consideration paid by one or more joint
tortfeasors represents an amount that is ultimately deter-
mined to be full compensation for the injury, the other joint
tortfeasors are discharged completely; this is on the basis
that there is only one injury which was caused jointly. The
Act, and specifically section 19, is based on joint or common
liability of two or more defendants for one injury. The
action causing the injury is seen as one action with two or
more acting in common.

The applicability of the Act to punitive damages,
however, is inappropriate. Punitive damages are inherently
different from compensatory damages and the reasons for
the award of each differ sharply. The award of compensa-
tory damages is an attempt to make the plaintiff whole
again by monetary compensation. In contrast, the award of
punitive damages does not attempt to compensate the plain-
tiff for harm suffered by him but rather is exemplary in
nature and is over and above any award of compensatory
damages. The fundamental purpose of a punitive damage
award is to punish the wrongdoer for misconduct and to
deter future egregious conduct by others. *Cheek v. J.B.G.
Properties, Inc.*, 28 Md.App. 29, 43–44, 344 A.2d 180 (1975).
In *Embrey v. Holly*, 293 Md. 128, 442 A.2d 966 (1982), the
Court explained: "punitive damages are awarded, over and
above full compensation, to punish the wrongdoer to teach
him not to repeat his wrongful conduct and to deter others
from engaging in the same conduct." 293 Md. at 141, 442
A.2d 966 (quoting *Wedeman v. City Chevrolet Company*,
278 Md. 524, 531, 366 A.2d 7 (1976)).

Because of the exemplary nature of punitive dam-
ages, defendants may not be held jointly and severally liable

---

**3.** The Act abrogates the common law rule that a release of one
tortfeasor released all. Md.Ann.Code art. 50, § 19 (1979); *Loh v.
Safeway Stores, Inc.*, 47 Md.App. 110, 422 A.2d 16 (1980). Instead, it
provides a calculus by which the court and parties may compute the
effect of one joint tortfeasor's contribution on another's common
liability in tort.

for such damages. Instead, punitive or exemplary damages may be awarded in different amounts against several defendants or they may be awarded against one or more of the defendants and not others, depending, not upon the damages sustained by the plaintiff, but upon the differing degree of culpability or the existence or nonexistence of malice on the part of the defendants. *Embrey*, 293 Md. at 141–42, 442 A.2d 966; *Cheek*, 28 Md.App. at 43–45, 344 A.2d 180 (1975).

■ In light of these significant differences, we conclude that the Uniform Contribution Among Tortfeasors Act does not apply to punitive damages. The Act applies only to compensatory damages, where there is common liability among joint tortfeasors.

## B.

### *Punitive Damages Contingent On Compensatory Award*

Exxon also contends that there should be no recovery of punitive damages because there were no compensatory damage awards to the Yaremas and S & S. These awards were satisfied fully by settlements with joint tortfeasors, which were the bases for the striking of the compensatory damage awards by the trial court. The Maryland rule is that punitive damages may not be awarded absent compensatory damages. *Montgomery Ward & Company v. Keulemans,* 275 Md. 441, 446, 340 A.2d 705 (1975); *Shell Oil Company v. Parker,* 265 Md. 631, 644, 291 A.2d 64 (1972); *B & B Refrigeration v. Stander,* 263 Md. 577, 582, 284 A.2d 244 (1971); *Kneas v. Hecht Company,* 257 Md. 121, 125, 262 A.2d 518 (1970); *Delisi v. Garnett,* 257 Md. 4, 9, 261 A.2d 784 (1970); *Gorman v. Sabo,* 210 Md. 155, 162, 122 A.2d 475 (1956); *Rispoli v. Jackson,* 51 Md.App. 606, 612–13, 445 A.2d 349 (1982).

■ The facts in this case, however, do not justify the application of this rule. The Yaremas and S & S settled with Exxon's co-defendants and gave releases to those

settling defendants. Under the Uniform Contribution Among Tortfeasors Act, these settlements do not constitute a discharge of other tortfeasors' liability. Md.Ann.Code art. 50, § 19 (1979). Accordingly, the jury was authorized to render a verdict as to compensatory and punitive damages in the case against Exxon. The jury awarded compensatory and punitive damages to both of these plaintiffs. At this point in time, the Yaremas and S & S had satisfied "the general rule that punitive damages cannot be recovered *without proof of actual loss." Shell Oil Company v. Parker*, 265 Md. 631, 640, 291 A.2d 64 (1972) (emphasis added). Only if plaintiffs had failed to prove compensatory damages in their suits would they be precluded from recovering punitive damages. The trial court's subsequent reduction of their compensatory awards to zero was not a determination that the compensatory damages awards were not appropriate, but that the Yaremas and S & S were statutorily precluded from collecting them because of their previous settlements. Since the jury found actual damages for the Yaremas and S & S, the awards of punitive damages were proper.

Exxon cites *Hilbert v. Roth*, 395 Pa. 270, 149 A.2d 648 (1959), as legal precedent for the proposition that satisfaction of liability through settlement releases a joint tortfeasor from claims for both compensatory and punitive damages. In *Hilbert* plaintiff brought separate suits against two joint tortfeasors. Against one defendant, he sought only compensatory damages, while against the other, he sought both compensatory and punitive damages. Plaintiff obtained against the first defendant a judgment which awarded him compensatory damages and which was satisfied before completion of litigation against the second tortfeasor. Reasoning that plaintiffs are entitled to "but one satisfaction," the court held that the satisfied judgment released the second tortfeasor from all liability for compensatory damages. 149 A.2d at 651–52. Since plaintiff's punitive damages award was contingent upon an award of compensatory damages, the court dismissed the action for punitive damages. *Id.* at 652.

Exxon's reliance on *Hilbert* is misplaced. The Court in *Hilbert* was concerned with satisfaction of judgments and not releases by settlement. The Uniform Contribution Among Tortfeasors Act, however, distinguishes between satisfaction of judgments and releases. *Compare* Md.Ann. Code art. 50, § 18 (1979) (statutory rule applying to judgments) *with id.* § 19 (statutory rule applying to releases). As construed by Maryland Courts, the Act provides that the satisfaction of judgment bars further action. *Grantham v. Board of County Commissioners,* 251 Md. 28, 37–38, 246 A.2d 548 (1968). An unsatisfied or partial satisfaction, however, does not discharge another for the same harm. *Grantham,* 251 Md. at 38–39, 246 A.2d 548; *Trieschman v. Eaton,* 224 Md. 111, 118–19, 166 A.2d 892 (1961). Similarly, a release does not discharge other tortfeasors, since "§ 19 of the Md. Act protects the plaintiff's right to sue other tortfeasors from an unintended release effected at common law by a release given to one joint tortfeasor." *Martinez v. Lopez,* 300 Md. 91, 105, 476 A.2d 197 (1984). *Accord Swigert v. Welk,* 213 Md. 613, 619–22, 133 A.2d 428 (1957). In *Hilbert* the court not only recognized this distinction, but explained its logic:

> It is not at all unreasonable that releases and satisfactions should be treated differently. A release, even after entry of a judgment, may well be the result of a compromise for less than the full value of the plaintiff's claim. This is especially so where more than one tortfeasor may be held responsible, for the one seeking to be released by compromise would not readily pay more than his own proportionate share of the damages knowing that other tortfeasors were available to pay their share. Hence we believe that in § 4 [our § 19] the legislature quite reasonably enacted that such a release is not a discharge of other tortfeasors unless it specifically so states.

395 Pa. 270, 274–75, 149 A.2d 648, 651 (1959).

Unlike the plaintiff in *Hilbert,* who had received satisfaction of judgment and was thus barred from further actions,

plaintiffs in the case *sub judice* had merely settled with several of the defendants. There is no dispute that the releases signed in consideration thereof permitted plaintiffs to continue their suits against the remaining defendants for both compensatory and punitive damages. The trial court, thus, did not err when it refused to offset the punitive, damages awards.

## III.

### *Improper Communication With Jury*

Because of the absence of certain counsel, Exxon requested, and the other parties present agreed, that no counsel would be present in the courtroom when the trial judge assembled the jurors for the purpose of dismissing the alternates and explaining the special verdict sheets. After Judge Sfekas had explained the verdict sheets,[4] he asked the jurors: "Do you have any question about anything that I can answer without having to get counsel?" The following colloquy then occurred:

---

4.

The following is the form verdict sheet which was given to the jury for disposition of each of the cases:

VERDICT SHEET

In Case No. _____ v. Exxon Corp. and Patrick Storto:

1. Do you find Defendant Exxon Corp. liable for the injuries and damages of Yarema's Lake, Inc.?
 a. On the basis of negligence Yes__ No__
 b. On the basis of nuisance Yes__ No__
 c. On the basis of strict liability Yes__ No__
2. Do you find Defendant Patrick Storto liable for the injuries and damages to Yarema's Lake, Inc.?
 a. On the basis of negligence Yes__ No__
 b. On the basis of nuisance Yes__ No__
 c. On the basis of strict liability Yes__ No__

If you have answered yes to any of the above, what amount of compensatory damages do you award this Plaintiff? $_____

As to Defendant Exxon only, if you have answered yes to 1a or 1b above, do you find that punitive damages are warranted? Yes__ No__

If yes, in what amount $_____

THE FOREPERSON: I have one question.

THE COURT: Go ahead.

THE FOREPERSON: If we find for punitive damages, is it within our jurisdiction to find subject to say we award just for a figure, a million dollars and make it subject to if the contamination is not cleaned up after a year, or do we have to just put one amount and that's it?

THE COURT: (Nods negatively.) We have only the evidence that we have in the case. We can't surmise. We can't speculate. You remember we said that over and over again, so we can't speculate. You have to decide the case on exactly what you have and make a decision. It's a tough question, I know.

JUROR NO. 5: The lands that we feel or the property that we feel are affected by the northern plume, if we feel that—

THE COURT: Stop there.

JUROR NO. 5: Stop there. Okay.

THE COURT: All right. These are the things that you have to agonize over and work out. I just trust that you understood the joint tortfeasor instruction that the Court gave you and counsel discussed at great length, and I trust by now that you understand it.

THE FOREPERSON: When we find on each of the counts, if we feel that it is a joint tortfeasor, when we deliver our verdict, do we tell you that, or do you decide that?

THE COURT: No. You have your verdict sheet. These are questions that I would have to take up with counsel, so I can't answer them.

THE FOREPERSON: Okay.

THE COURT: Again, we have come this far, so let's not—

JUROR NO. 2: Does joint tortfeasor apply even though the other companies are out of the case, or you can't answer that, either?

THE COURT: No.

JUROR NO. 7: This is question and answer, Judge.

THE FOREPERSON: But it's still on the record.

THE COURT: Once the case is handed to you, the only question that the Court can answer is a question that is submitted in writing by the Foreman that I would take up with counsel, and ninety-nine percent of the time the answer that comes back to you is, you have heard the evidence. Do the best you can.

I meant if you had any question about procedure. You are getting into the merits of the case, and I can't take that up with you as much as I would like to. I can't. Okay.

■ Exxon now argues that this colloquy constituted reversible error because the trial judge invited and answered substantive questions without the presence of counsel. The general rule is that a judge shall not answer questions from the jury without first informing and then giving counsel an opportunity to address the court's proposed answers. Md.Rule 2–521(c). *See also Rogers v. United States,* 422 U.S. 35, 39–41, 95 S.Ct. 2091, 2094–95, 45 L.Ed.2d 1 (1975); *Brown v. State,* 236 Md. 505, 510–11, 204 A.2d 532 (1964); *Hebb v. State,* 44 Md.App. 678, 410 A.2d 622 (1980). In the case *sub judice,* Exxon's counsel was present and did have the opportunity to participate in this colloquy, if he had not voluntarily withdrawn his presence. Exxon's voluntary withdrawal constituted a waiver of appellant's right to be present at the time of the exchange between the trial judge and the jurors.

It was the duty of counsel to be present and the court's right to proceed with its business is not curtailed by the absence of counsel, if the opportunity to be present had been afforded and counsel voluntarily waived that right. 75 Am.Jr.2d *Trial* § 52, at 165–66 (1974). Any possible errors were waived by Exxon's affirmative act of absenting itself and thereby implicitly assenting to the court's proceeding without its presence. 89 C.J.S. *Trial* § 658, at 501 (1955).

The situation in the case *sub judice* is analogous to that in a criminal case where the defendant absents himself after the commencement of the trial. Under former Maryland Rule 724, new Rule 4–231(c), a defendant who had been present at trial waives his right to be present when he voluntarily absents himself. *Bell v. State*, 48 Md.App. 669, 675–76, 429 A.2d 300 (1981). It is also analogous to the situation where an attorney waives cross-examination or objection to the proffered questions of opposing counsel, *Sell v. Volkswagen*, 611 S.W.2d 897, 900–01 (Tex.Civ.App. 1981) or where counsel makes no complaint about a judge's instructions and then subsequently attempts to claim that the instructions were in error. *Bodine v. Boyd*, 383 Pa. 525, 119 A.2d 274 (1956); *Proto v. Bridgeport*, 136 Conn. 557, 72 A.2d 820 (1950).

Assuming, *arguendo*, that Exxon waived its rights only for the limited purposes of dismissing the alternates and explaining the special verdict sheet, Exxon contends that the trial court exceeded the scope of its waiver and answered substantive questions from the jury that prejudiced Exxon. There is little doubt that the jurors attempted to ask substantive questions about the case; however, Judge Sfekas neither invited such questions nor gave substantive answers.

 Aware that he was conducting a *sans parte* session, the judge limited questions to "anything that I can answer without having to get counsel." When questions which required the presence of counsel came up, Judge Sfekas couched his answers in nonresponsive general terms. The trial judge's responses to the jurors' substantive questions falls within the bounds that the Court of Appeals has found acceptable. In *Brown v. State*, 236 Md. 505, 204 A.2d 532 (1964), the trial judge refused to answer questions that two members of the jury asked during a criminal trial in chambers and out of the presence of counsel. Instead, he advised the jurors to submit questions in writing at the

resumption of the trial, the following morning. In finding no reversible error, the Court stated:

> The record shows that the audience with the two jurors was thus summarily terminated by the trial judge, with no attempt to answer the questions which they posed and with no other discussion of the case. The actions of the judge under the circumstances were prudent and not prejudicial to the appellant.

*Brown,* 236 Md. at 510–11, 204 A.2d 532. *See also Foster v. State,* 267 Ind. 79, 367 N.E.2d 1088, 1089 (1977) (holding that judge's sole communication with jury during its deliberation of case is not reversible error when judge refused to answer substantive questions).

The predeliberation exchange between Judge Sfekas and the jurors, although more protracted, bears a striking resemblance to the situation in *Brown.* Not only did Judge Sfekas refuse to engage the jurors in a question and answer session on any matter, but during the procedures relating to the jury sheets, the judge instructed the jury that he could only answer questions that were submitted in writing and taken up with counsel. Since the record reveals that not only did appellant's counsel waive his presence but in addition Judge Sfekas' communications were not prejudicial, we find no reversible error.

## IV.

### *Physical Impact As Condition Precedent*

Since some of plaintiffs' property has not been contaminated by leaks from its service station, Exxon argues that there can be no recovery based on nuisance, negligence or strict liability.

The record supports the conclusions that neither S & S's property nor the office building owned by Ascot were contaminated by the Exxon leaks. Both plots are upgradient and a substantial distance from Exxon's underground gasoline tanks. In contrast, uncontroverted evidence was presented that demonstrated that Exxon's contamination

had spread to five vacant lots owned by Ascot as well as the extreme western edge of the Manor Shopping Center parking lot. As previously noted, the parties have hotly contested the issue of whether the Yaremas' property was contaminated. Although expert testimony established that the Yaremas' property sits on a geological ridge, safe from contamination, plaintiffs introduced evidence indicating that this property nevertheless was contaminated.

### A.

### *Nuisance*

Exxon asserts that the trial court erred in denying its motions for judgments as to the Yaremas and S & S. In both cases, Exxon alleges that it did not contaminate plaintiffs' properties and that diminution in property value with no tangible or physical impact upon plaintiffs' property is not enough to constitute nuisance. Instead, Exxon insists that, for nuisance to exist, the injury must also "seriously interfere with the ordinary comfort and enjoyment of [the property]." *Meadowbrook Swimming Club v. Albert*, 173 Md. 641, 645, 197 A. 146 (1938). *See McCaw v. Harrison*, 259 S.W.2d 457 (Ky.1953) (holding that no nuisance exists where defendant's conduct only "tends to depreciate the value of property in the neighborhood"); *Sanders v. Roselawn Memorial Gardens*, 152 W.Va. 91, 159 S.E.2d 784, 798 (1968) (requiring appreciable, substantial, tangible injury resulting in actual, material, physical discomfort).

As to the property owned by the Yaremas, Exxon's evidential characterization is inaccurate. Sufficient evidence was presented to the jury from which could reasonably conclude that the appellant in fact contaminated their property. On the other hand, evidence presented indicates that S & S's property as well as Ascot's office building plot suffered no injury from physical contamination. Although no court in Maryland has considered this point, Exxon argues that other case law extant in Maryland, as well as that from other jurisdictions, supports the propo-

sition that a plaintiff may not recover in tort when there is no tangible or physical impact on plaintiff's property. We conclude that there is no such rule of law.

■ The Restatement defines private nuisance as "a nontrespassory invasion of another's interest in the *private use and enjoyment of land.*" Restatement (Second) of Torts § 821D (1977) (emphasis added). The Restatement does not speak exclusively in terms of physical or tangible invasion of land. Rather it emphasizes:

> " 'Interest in use and enjoyment' also comprehends the *pleasure, comfort and enjoyment* that a person normally derives from the occupancy of land. *Freedom from discomfort and annoyance* while using land is often as important to a person as freedom from physical interruption or freedom from detrimental change in the physical condition of the land itself."

Restatement (Second) of Torts § 821D, comment b, at 101 (1977) (emphasis added). All tangible intrusions, such as noise, odor, or light fall within the realm of nuisance.

For example, Maryland has recognized that excessive noise may constitute nuisance for which an action lies at law or in equity. *Meadowbrook Swimming Club, Inc. v. Albert*, 173 Md. 641, 645, 197 A. 146 (1938). In *Meadowbrook* plaintiffs, residents of a nearby community, sought to enjoin the defendant from playing loud jazz music on its property. Although there was no physical trespass, the Court held that the emanation of loud music from defendant's resort deprived plaintiffs of the reasonable use and comfortable enjoyment of their homes, and ordered the abatement of that nuisance. 173 Md. at 648–49, 197 A. 146.

Courts in Maryland have also recognized such actions for damages as well as for injunctive relief. In *Gorman v. Sabo*, 210 Md. 155, 122 A.2d 475 (1956), the defendants, even after being asked not to do so on numerous occasions, continuously played a radio at an excessive volume, directed at plaintiffs' home, with the sole articulated purpose of forcing the plaintiffs to move from the neighborhood. *Id.*

at 160–61, 122 A.2d 475. The Court ruled that these loud and offensive sounds interfered seriously with plaintiffs' ordinary comfort and enjoyment of their property and thus constituted a private nuisance, for which those offended may recover actual and punitive damages. *Id.* at 162–64, 122 A.2d 475.

Exxon contends that, although these cases involve an intangible, nontrespassory intrusion, there was a physical invasion onto plaintiff's property nonetheless, i.e., sound waves, which originated on defendant's property, passed over onto plaintiff's property. Exxon argues that the key element in nuisance is an actual impact on plaintiff's land, without which plaintiff may not recover in nuisance, or any other tort, for that matter.

■ We find this highly technical interpretation of the law of nuisance unpersuasive. As we have already mentioned, the Restatement emphasizes: "Freedom from discomfort and annoyance while using land is often as important to a person as freedom from physical interruption or freedom from detrimental change in the physical condition in the land itself." Restatement (Second) of Torts § 821D, comment b, at 101 (1977). Nuisance is not contingent upon whether the defendant physically impinged on plaintiff's property, but whether the defendant substantially and unreasonably interfered with plaintiff's use and enjoyment of its property. This accords with Prosser's LAW OF TORTS:

A disturbance of the comfort or convenience of the occupant, as by ... loud noises is a nuisance.... So long as the interference is substantial and unreasonable, and such as would be offensive or inconvenient to the normal person, virtually any disturbance of enjoyment of property may amount to a nuisance.

§ 72, at 406–07 (2d ed. 1955) (emphasis added), *quoted with approval in Gorman v. Sabo*, 210 Md. 155, 159, 122 A.2d 475 (1956).

Accordingly, the gravamen of the case *sub judice* is not whether a nontrespassory, intangible invasion of real prop-

erty physically impinges on the plaintiffs' land, but whether the contamination of water caused by Exxon's leaking storage tanks interfered with the plaintiffs' use and enjoyment of their properties.

Maryland case law and that of other jurisdictions comports with this approach. The Wisconsin Supreme Court has held that the owner of a solar-heated residence has a cause of action in common law private nuisance for the alleged obstruction of solar access by an adjoining landowner. *Prah v. Maretti,* 108 Wis.2d 223, 321 N.W.2d 182 (1982). The Wisconsin court did not focus on the technical requirement that shadows cast by the obstructing building somehow physically invaded plaintiff's land, but rather focused on the issue of whether defendant's actions substantially and unreasonably interfered with plaintiff's property rights:

> The rights of neighboring landowners are relative; the uses by one must not unreasonably impair the uses of the other.... When one landowner's use of his or her property unreasonably interferes with another's enjoyment of his or her property, the use is said to be a private nuisance.

*Id.* 321 N.W.2d at 187 (footnote and citations omitted). *See also E.H. Wilson v. Interlake Steel Company,* 32 Cal.3d 229, 185 Cal.Rptr. 280, 649 P.2d 922 (1982) (holding that emission of sound waves alone, without damage to property, while not sufficient to maintain an action in trespass, could support a possible nuisance action).

On several occasions, where there was no physical invasion of property, the Court of Appeals has sustained actions in nuisance. In the most unusual case of *Mayor and City Council of Baltimore v. Fairfield Improvement Company,* 87 Md. 352, 39 A. 1081 (1897), for example, the Court held that keeping a woman with leprosy on a neighboring tract of land constitutes a public nuisance to the adjoining properties. In issuing the injunction against the City, the Court imposed no threshold requirement as to physical invasion onto plaintiffs' land. The principal concern of the

Court was not whether the leprosy had in fact spread to plaintiffs' property, but whether there existed a threat of harm to plaintiffs' property and person.

There are modern theories and opinions of medical experts that the contagion is remote and by no means dangerous, but the popular belief of its perils founded on the Biblical narrative, on the stringent provisions of Mosaic law that show how dreadful were its ravages and how great the terror which it excited, and an almost universal sentiment, the result of a common concurrence of thought for centuries, cannot in this day be shaken or dispelled by mere scientific asseveration or conjecture. It is not, in this case, so much a mere academic inquiry as to whether the disease is in fact highly or remotely contagious, but the question is whether viewed as it is by the people. Generally, its introduction into a neighborhood is calculated to do a serious injury to the property of the plaintiff there located. As to this the record leaves no room for doubt. That the disease is contagious no one seems to deny. Its liability [i.e. tendency] to contaminate others is the element that makes its introduction into a community a nuisance....

87 Md. at 365, 39 A. 1081. While the outcome of that case today may have been different because of changed social attitudes and advanced scientific information, the legal principle on which this case turns has not changed.

Another example in which actual invasion or direct physical impact on plaintiff's land was not required is *Hendrickson v. Standard Oil Company,* 126 Md. 577, 95 A. 153 (1915). In that case, the defendant, Standard Oil Company, stored explosives and highly flammable materials on its property adjacent to plaintiff's land, and also constructed a large tank on that land for the purpose of storing vast quantities of highly flammable and explosive oils. 126 Md. at 586–87, 95 A. 153. Based upon the *threat of future harm,* which the storage of large amounts of highly explosive and volatile substances posed to the plaintiff's property, the Court determined that a private nuisance existed.

*Id.* at 587, 95 A. 153. Notwithstanding the fact that there was no physical invasion, the Court concluded that these dangerous conditions interfered with plaintiff's reasonable use and enjoyment of his property.[5] *Id.*

From these cases we conclude that Exxon's reading of the law of nuisance is hyper-technical and misdirected. Although a nuisance may involve a physical impact much of the time, that is not an essential element of the tort. The tort of nuisance should be viewed as a disturbance of some right or interest in land which may or may not involve physical invasion of plaintiff's property.[6]

The legal implications of our conclusion fall squarely within the accepted principles of nuisance law. According to the general view, there must be a substantial interference with the plaintiff's reasonable use and enjoyment of its property. We believe that our conclusion does not violate the established rule that the mere diminution of property value, absent such tortious interference, is not sufficient basis for recovery. *E.g., McCaw v. Harrison,* 259 S.W.2d 457, 458 (Ky.1953) (holding that a cemetery did not constitute a nuisance "merely because it is a constant reminder of death and has a depressing influence on the minds of

---

5. Exxon attempts to distinguish *Fairfield* and *Hendrickson* on grounds that those cases involved injunctions against intentional future actions entailing risk of physical danger. While this is accurate, Exxon provides no legal support why different standards should apply to nuisance actions at law and in equity. On the contrary, not only have courts applied one standard uniformly but the court in *Hendrickson* explicitly recognized "that the law on this subject is 'the same whether it be enforced by action at law [for damages] or by bill in equity [for injunctive relief].'" *Hendrickson v. Standard Oil Company,* 126 Md. 577, 585, 95 A. 153 (1915) (quoting *Crump v. Lambert,* 3 Eq.Cases 409). Moreover, as the Court in *Fairfield* noted, the equitable remedy to prevent a nuisance arises merely when "... the nature of the injury is such, that it cannot be adequately compensated by damages or will occasion a constantly recurring grievance." *Fairfield,* 87 Md. at 357, 39 A. 1081 (quoting *Susquehanna Fertilizer Company v. Spangler,* 86 Md. 562, 39 A. 270 (1898)).

6. For a general discussion of Maryland law *see generally* R.P. Gilbert, P. Gilbert & R.J. Gilbert, Maryland Tort Law Handbook § 18 (1986).

persons who observe it, or because it tends to depreciate the value of property in the neighborhood, or is offensive to the aesthetic sense of the adjoining proprietor"); *Gray v. Southern Facilities,* 256 S.C. 558, 183 S.E.2d 438, 443 (1971) (holding that plaintiff may not recover when "appellant's claim for damages is predicated upon an asserted diminution in market value resulting, not from any physical injury, but from a psychological factor, in that prospective buyers allegedly would be reluctant to purchase the property due to fear of a similar occurrence in the future"). Our holding that physical impact is not necessary to sustain a tort action does not mean that plaintiffs may recover for diminution of property value without proof of harm to their property but rather that harm to property should be construed broadly to include intangible tortious interferences of plaintiffs' use and enjoyment of their properties.

Close examination of the facts in *McCaw* and *Gray* indicates that defendants' actions had not interfered with the reasonable use and enjoyment of plaintiffs' properties. In *McCaw*, plaintiffs attempted to enjoin prospectively the establishment of a cemetery without any proof of contamination or endangerment to plaintiffs' welfare. In dismissing the action, the court did note, however, that in the future "if the location or maintenance of a cemetery endangers the public health, either by corrupting the *surrounding atmosphere,* or water wells or springs, it constitutes a nuisance." *McCaw,* 259 S.W.2d at 458 (emphasis added). Although some evidence of actual contamination is necessary to interfere tortiously with plaintiffs' property rights, the court suggested that actual contamination of plaintiffs' well is not a prerequisite. Similarly, in *Gray,* plaintiff sought compensation for damages that resulted from a flash fire on the waters of a nearby creek. *Gray,* 183 S.E.2d at 439. In refusing to allow plaintiff's recovery, the court focused on the fact that the only damage to plaintiff's property was psychological: prospective buyers would be apprehensive and reluctant about purchasing property in the vicinity where the flash fire occurred. *Id.* at 443. The

court, moreover, found it unnecessary "to decide whether or not, or under what circumstances, damages might be recovered for injury to the reputation of real property."

■■■ The facts in those cases differ sharply from those in the case *sub judice.* In neither of those cases was there substantial interference with the plaintiffs' reasonable use and enjoyment of its property. The plaintiffs could sell the property whenever they chose; they were not precluded from building on their land; and they were not prevented from using water from their wells. There was no interference with their rights or interests incident to ownership of their properties. In contrast, Exxon has interfered with S & S's, the Yaremas' and Ascot's use and enjoyment of their land. Gasoline contamination of ground water imposed crippling restrictions not only on the contaminated land but on all the property adjacent to that land. The Baltimore County Health Department forbade plaintiffs from using their ground water, building houses on their land or selling the land even at a reduced price. These are injuries for which the plaintiffs are entitled to recover if the jury believed that they were caused by Exxon's tortious interference with their property rights. The fact that the reputation of the plaintiffs' land is inextricably interwoven in the assessment of damages is not reason to avoid an award.

## B.

### *Negligence and Strict Liability*

Although plaintiffs' nuisance actions provide ample authority to sustain the jury's award of damages, their actions in negligence and strict liability also justify recovery.

■■■■■ Under the theory of negligence, the leaking underground storage tanks, as well as Exxon's tardy remedial response to contain the contamination, constituted a breach of its duty to its neighboring landowners not to impair their ownership rights through water contamination. As to strict liability, the Court of Appeals has recognized that the

placement of large underground gasoline tanks in close proximity to private residences and drinking wells constitutes an abnormally dangerous activity from which strict liability may flow. *Yommer v. McKenzie*, 255 Md. 220, 257 A.2d 138 (1969).

■ Under each theory of recovery, plaintiffs seek compensation for all the damages that are the natural consequences of the ground water contamination. Plaintiffs argue that a direct chain of causation exists: the release of toxic contaminants polluted the ground water, which in turn prompted the Baltimore County Health Department to issue land restrictions as to the use of water, the obtaining of building permits and the resale of property. These health restrictions, plaintiffs argue, drastically impaired their use and enjoyment of their properties as well as reduced the value of those properties. In response Exxon again argues that the physical impact requirement should cut short the chain of causation, thus precluding S & S, the Yaremas and Ascot (as to its office building) from recovery.

Courts in Maryland have not insisted upon physical impact as a condition precedent, even to a recovery of damages for personal injuries based on negligence. In *Bowman v. Williams*, 164 Md. 397, 165 A. 182 (1933), the Court held a plaintiff may recover for physical injuries resulting from nervous shock, even though there was no actual physical impact. 164 Md. at 400–01, 165 A. 182. In *Bowman*, the plaintiff was standing at the window of his residence when defendant's truck ran into the side of the house below where plaintiff was standing. Plaintiff's two children were in the basement and, although there was no physical impact to the plaintiff or to his children, the plaintiff was injured by his fright and concern for his children's safety. *Id.* at 398–99, 165 A. 182. Despite the absence of impact, the Court ruled: "the father could have recovered whether this fright was for the safety of his children or of both himself and the children." *Id.* at 405, 165 A. 182.

Maryland case law also suggests that we should not apply a hyper-technical impact requirement to injury to property. In *Toy v. Atlantic Gulf & Pacific Company,* 176 Md. 197, 4 A.2d 757 (1939), the plaintiffs brought an action alleging injury to the value of their property as a result of the deposit of great quantities of earth into a creek adjoining plaintiff's land. The defendant, a company hired to dredge the Chesapeake and Delaware Canal, deposited dredged material on a nearby embankment. The injury occurred when a substantial amount of dredge material and its supporting embankment collapsed into the creek. 176 Md. at 205, 4 A.2d 757. The Court noted specifically that "the premises of the plaintiffs were not invaded," *id.,* but nevertheless determined that sufficient injury to plaintiffs' property rights had been established: the unintentional filling of the channel deprived plaintiffs access to their property by boat and also interfered with the efficient operation of a pond constructed on plaintiffs' property for raising carp. *Id.* As a result, the Court held that:

> The destruction of these advantages greatly diminishes in value the property of the Plaintiffs, and was the cause of a particular and special injury for which an action will lie.[7]

*Id.* at 207, 4 A.2d 757.

Case law in other jurisdictions also supports the proposition that plaintiffs may recover for economic injuries that defendant's pollution caused, even though there was no physical damage to plaintiffs' property. A federal district court in Virginia held that owners of charter boats, marinas, and tackle and bait shops may recover damages for indirect economic harm from kepone pollution in the James River and Chesapeake Bay. *Pruitt v. Allied Chemical Corporation,* 523 F.Supp. 975 (E.D.Va.1981). Although in

---

**7.** In *Toy,* the Court ultimately affirmed the lower court's dismissal of the case based upon other grounds: plaintiff's failure to demonstrate either defendant's negligence or, under strict liability, that defendant was the owner, occupier or tenant of the property from which the earth escaped into the water.

*Pruitt* all of the plaintiffs claimed as damages profits lost as a result of their inability to sell seafood, allegedly contaminated by defendant's kepone contamination, damage to personal or real property was not alleged or proven. The Court, nevertheless, found a direct causal link between defendant's pollution and plaintiffs' pecuniary loss, and thus ruled that plaintiffs "suffered legally cognizable damages." *Id.* at 980. *See also Union Oil Company v. Oppen,* 501 F.2d 558 (9th Cir.1974) (holding that fishermen could recover lost profits from their commercial businesses which resulted from defendant's oil spill at sea without proof of injury to plaintiffs' person or property); *Masonite Corporation v. Steede,* 198 Miss. 530, 23 So.2d 756 (1945) (recognizing that a riparian owner may recover for loss of business opportunities due to pollution of streams adjoining a plaintiff's property where the plaintiff neither alleges nor proves physical damages to his real property).

## V.

### *Punitive Damages*

Exxon argues that (A) the trial court failed to apply the correct standard for the assessment of punitive damages; (B) the evidence presented at trial did not justify an award for punitive damages; and (C) the trial court erred by refusing to require that defendant's conduct be reckless or wanton as to particular plaintiffs, e.g., S & S and the Yaremas. We will address these contentions seriatim.

## A.

### *The Standard*

■■ Since punitive damages are assessed for punishment and not reparation, a positive element of conscious wrong doing is always required. Mere negligence or careless behavior is not sufficient. *Medina v. Meilhammer,* 62 Md.App. 239, 251, 489 A.2d 35 (1985). *See* Restatement of Torts (Second) § 908 (1977); 22 Am.Jur.2d, *Damages* § 250 (1965). Depending upon the circumstances, Maryland

courts have required either actual malice or its legal equivalent, implied malice. *See American Laundry Machinery Industries v. Horan*, 45 Md.App. 97, 111–12, 412 A.2d 407 (1980) (discussing the general guidelines for punitive damages). The Court of Appeals has characterized actual malice "as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure plaintiff." *H & R Block, Inc. v. Testerman*, 275 Md. 36, 43, 338 A.2d 48 (1975). In contrast, implied or legal malice is defined as "conduct of an extraordinary nature characterized by a wanton or reckless disregard for the rights of others." *Wedeman v. City Chevrolet Company*, 278 Md. 524, 532, 366 A.2d 7 (1976); *accord St. Paul at Chase v. Manufacturers Life Insurance Company*, 262 Md. 192, 239, 278 A.2d 12 (1971). In the instant case, which involves a pure tort action for injury to property, the defendant contends that actual malice is the proper standard. We do not agree.

In tort actions arising out of a contractual relationship, the general rule has been that plaintiffs must prove actual malice. *H & R Block*, 275 Md. at 44, 338 A.2d 48. As to "pure" tort actions, however, implied malice has been sufficient to support an award for punitive damages. *American Laundry Machinery Industries v. Horan*, 45 Md.App. 97, 115, 412 A.2d 407 (1980). This Court has had the opportunity, on several occasions, to apply the implied malice standard for pure tort actions. *See Medina v. Meilhammer*, 62 Md.App. 239, 489 A.2d 35 (1985) (negligence action for personal injuries and punitive damages resulting from scalding); *Harley-Davidson Motor Company, Inc. v. Wisniewski*, 50 Md.App. 339, 437 A.2d 700 (1981) (negligence and products liability case for compensatory and punitive damages), *cert denied*, 292 Md. 596 (1982).

Notwithstanding this precedent, Exxon insists that actual malice is the appropriate standard in pure tort actions that involve no personal or psychic injury. In support

of its position, Exxon cites personal injury cases in which the court has awarded punitive damages. Although personal injury actions may give rise to punitive damages more frequently, courts in Maryland have formulated no such rule based upon a distinction between injury to person and property. In fact, Maryland courts on several occasions have affirmed punitive damage awards in tort actions for economic damages. *Siegman v. Equitable Trust Company*, 267 Md. 309, 297 A.2d 758 (1972) (holding that plaintiff could recover punitive damages for conversion and wrongful dishonor by proving implied malice); *GAI Audio of New York, Inc. v. Columbia Broadcasting System, Inc.*, 27 Md.App. 172, 340 A.2d 736 (1975) (holding that proof of implied malice is sufficient to support an award of punitive damages in action for economic damages that resulted from unfair competition, conversion and conspiracy). Accordingly, we hold that the trial court applied the proper standard for the assessment of punitive damages.

## B.

### The Evidence

Even under the implied malice standard, Exxon argues that the evidence does not support an award for punitive damages. Under the implied malice standard, the plaintiff must prove that the defendant conducted himself in an extraordinary manner, "characterized by a wanton or reckless disregard for the rights of others." *Wedeman v. City Chevrolet Company*, 278 Md. 524, 532, 366 A.2d 7 (1976). In *American Laundry Machine Industries v. Horan*, 45 Md.App. 97, 412 A.2d 407 (1980), through Judge Wilner, we explained:

> Wanton and reckless conduct requires far more than mere negligence, or what may be ... inferred from it. *See* Restatement, *supra*, § 908. It requires, in this context, direct evidence of substantial knowledge on the part of the ... [tortfeasor].

45 Md.App. at 117, 412 A.2d 407. In *Harley-Davidson Motor Company, Inc. v. Wisniewski,* 50 Md.App. 339, 437 A.2d 700 (1982), this Court characterized "recklessness" as disregarding "a readily perceptible risk." 50 Md.App. at 347, 437 A.2d 700. Exxon concedes that its conduct was "negligent" and "less than perfect," but argues that its conduct did not rise to the level of wanton and reckless disregard. Exxon contends that it neither possessed a substantial knowledge that ground water had been contaminated, nor disregarded a readily perceptible risk thereof.

In support of its position, Exxon relies on the following facts presented to the jury: (1) only one leak in its premium unleaded gasoline tank in 1980 was a result of "a bookeeping error"; (2) as soon as it learned of each leak, Exxon responded in a prompt and responsible manner: no additional gasoline was pumped into the leaking tank, but rather its contents were immediately emptied and then the tank was repaired; (3) both Exxon and the Maryland Water Resources Commission inspected the surface environs after the leak, and neither perceived the "telltale signs" of gasoline leakage; (4) once the evidence of ground water contamination became apparent to Exxon, it undertook a comprehensive investigation of the surrounding ground water to determine the extent of its contamination problem, which included installation of forty-five observation wells; (5) as a result of Exxon's labors, Ascot and Manor became apprised of contamination on their properties and moreover, all plaintiffs relied on the fruits of Exxon's investigation in preparing their lawsuits; and (6) Exxon initiated a pumping operation to reduce both the size and level of contamination. Exxon contends that these facts demonstrate that it acted in a responsible manner once it acquired substantial knowledge of the contamination and that it did not act recklessly and in disregard for the health and safety of the community.

This scenario by Exxon hardly represents an accurate or complete story of the events surrounding the case. Plaintiffs presented substantial evidence to the jury that conflict-

ed with Exxon's view that the corporation acted in a responsible manner. For example, they introduced evidence that a second leak in Exxon's regular unleaded tank occurred in 1980 when Exxon's dealer observed inventory shortages, and notified Exxon's sales representative, Mr. Curd, who, after a full investigation, concluded that the tank had lost 703 gallons of unleaded gasoline. In an independent investigation, Exxon's maintenance representative reached the identical conclusion and thereafter the Exxon unleaded tank was emptied and repaired. Laboratory analysis of the contaminated ground water corroborates the view that two separate leaks occurred: one to the extra tank in 1979 and a second to the unleaded tank in 1980. The lab analysis revealed that samples of ground water matched a mixture of Exxon Extra (premium) and Exxon unleaded (regular) gasoline.

Contrary to Exxon's self-portrayal as a responsible corporation that attempted to minimize the health and safety risks of contamination to the community, plaintiffs presented considerable evidence that Exxon had knowledge of readily perceptible risks, which it disregarded. First, after Exxon became aware of the leaks, it not only delayed the removal of gasoline from its tanks but kept filling them with gasoline. There was evidence that between March 1979, when the Exxon dealer notified Mr. Curd of a leak in the Exxon Extra tank and the time that Exxon finally shut down operation of the leaking tank, Exxon made three deliveries totaling 4,500 gallons of gasoline into the tank. Almost 1,500 gallons leaked into the ground, for which Exxon ultimately reimbursed its dealer. Plaintiffs also produced evidence that in October 1980, the dealer notified Mr. Curd of the suspected leak and, only after Exxon made four deliveries totaling 11,501 gallons into that tank did Exxon take remedial actions. Meanwhile, an additional 700 gallons of gasoline leaked into the ground.

State law mandates that Exxon control, contain and remove any spillage:

Responsibility for prompt control, containment and removal of any spill oil shall be with the person responsible for the illegal discharge and shall remain with him until removal of spilled oil has been accomplished.

MD.ADMIN.CODE tit. 08, 05.04.07C(6)(a). For two years, however, Exxon made no effort to recover the lost gasoline. Based on its own expertise, Exxon admitted that a prompt response to a gasoline leak is essential to minimize contamination and that, if it had begun recovery efforts within a month after the losses were discovered, the contamination might possible have been confined to its own property.

Exxon relies on the fact that no gasoline contamination was readily perceptible. Mr. Griffin, Exxon's maintenance representative, testified: "I didn't see any presence of raw gasoline coming out of the slope or the bank to the rear of the station. I didn't see any gasoline in the area of the storm shower drain, the telltale signs were not there." Physical observation of the surface area, however, should not have been dispositive of the matter since the evidence showed Exxon knew that gasoline tends to seep downwards into the soil and may contaminate the ground water. Based on discrepencies of inventory levels, Exxon believed it had lost over two thousand gallons of gasoline. Moreover, Exxon had the expertise and resources to ascertain whether the escaped product had reached the ground water. According to its own guidelines, methodologies for such a determination were not limited to physical observation, but included the construction of observation wells. Exxon nonetheless waited almost two years after the discovery of the first leak to drill the observation wells and to "document" finally the leaks and inevitable contamination. Nowhere in the testimony does Exxon explain its delay in testing ground water samples. This silence suggests it was hoping that no significant ground water contamination would manifest itself.

Moreover, evidence was adduced showing that Exxon's primary motivation may have been its profit interest, and not the health and safety of the Jacksonville community.

There was evidence that Exxon's failure to take adequate testing and safety measures and to take the necessary steps to recover the lost gasoline were attributable to the fact that it intended to close down the gas station where the leaking tanks were located. For example, after Exxon discovered the first leak in 1979, the decision not to take the precaution of performing preventive maintenance on the remaining tanks was made not by the engineering department, but by the sales department. This decision, contrary to Exxon's adopted procedures, was made in order "to limit expenses at that particular station" because, it appears, that station was slated to be closed and relocated.

Even though it knew that gasoline and its components are toxic and pose serious risks to humans if ingested, Exxon failed to file reports with county, state and federal authorities and failed to disclose the existence of the problem to surrounding property owners. Moreover, Exxon's subsequent conduct was, to say the least, uncooperative and misleading. As late as 1981, its maintenance representative met several times with Mrs. Weir, a neighboring landowner, about her contamination problem. Not once, however, did he inform Mrs. Weir that Exxon had lost gasoline product, but rather, contrary to Exxon's knowledge, he speculated to her that deterioration and degeneration of farm equipment located on her property could have been the source of her ground water contamination. Exxon's representations to the county, state and federal authorities also could appear to have been calculated to mislead. Specifically, Exxon veiled any admissions of gasoline leakage behind assertions of "not confirmed" or "not verified." Such behavior suggests that Exxon's corporate disposition was to disregard the health and safety of the community.

The Restatement (Second) of Torts § 908, comment d (1965) discusses the function of the jury in the award of punitive damages:

> Whether to award punitive damages and the determination of the amount are within the sound discretion of the trier of fact, whether judge or jury. It is error, however,

for the trier of fact to award punitive damages if there has been no bad motive or wanton indifference.

*Id. See Dennis v. Baltimore Transit Company,* 189 Md. 610, 617, 56 A.2d 813 (1947) (stating that the issue of malice is a question for the jury). In the case *sub judice,* we must reverse the award only if plaintiffs have failed to present any evidence, as required by the implied malice standard, of Exxon's wanton indifference or reckless disregard for the rights of others.

■ Based on our review of the evidence, plaintiffs have met this burden of proof. In summary, plaintiffs have introduced evidence showing:

(1) After acquiring substantial knowledge that its tanks were leaking in 1979 and in 1980, Exxon's immediate response was to disregard the serious risks of ground water contamination by continuing to pump more gasoline into leaking tanks.

(2) Although Exxon possessed strong evidence that a substantial amount of gasoline had leaked into the ground and the expertise and resources to minimize the possible contamination, it delayed any recovery operation for almost two years, disregarding the requirements of State law and the environmental and health risks to the community.

(3) Exxon's conduct was not founded on lack of knowledge or inexperience, but on managerial decisions to maximize profits.

(4) Exxon's failure to report the leakage to the proper authorities and to possibly affected nearby property owners, as well as its subsequent misleading statements, and its failure to use its expertise in attempting to prevent contamination, suggests a corporate disposition to disregard the health and welfare of the people of the community.

Exxon vigorously disputes much of the evidence that plaintiffs have presented, so that much of the crucial evidence pertaining to punitive damages remains in conflict. In our review of the sufficiency of the evidence, however, we must "resolve all evidentiary conflicts in favor of the

plaintiff and assume the truth of all evidence and inferences that may 'naturally and legitimately be deduced therefrom in favor of plaintiff's right to recover.'" *Plitt v. Greenberg,* 242 Md. 359, 367, 219 A.2d 237 (1965) (quoting *Smith v. Bernfeld,* 226 Md. 400, 174 A.2d 53 (1961)). Accordingly, the fact that Exxon is able to construct a plausible scenario that differs substantially with plaintiffs' version will not change the outcome of the case. The dispositive issue is whether plaintiffs "... have presented any legally relevant and competent evidence which generated punitive damages as an issue to be decided by the jury." *Medina v. Meilhammer,* 62 Md.App. 239, 489 A.2d 35 (1985). From the summary of evidence set out above, it is clear to us that plaintiffs presented sufficient evidence upon which the jury could have concluded that Exxon's actions, in *toto,* amounted to a wanton or reckless disregard of plaintiffs' rights. When there is legally sufficient evidence to support a jury verdict, this Court will not inquire into the weight of the evidence. *Durant v. Superintendent, Clifton T. Perkins State Hospital,* 251 Md. 467, 473, 248 A.2d 148 (1968); *accord Gray v. Director,* 245 Md. 80, 84, 224 A.2d 879 (1966); *Montgomery v. Director,* 244 Md. 700, 701–02, 223 A.2d 776 (1966).

Exxon nonetheless argues that its post-tort actions negate the jury's finding that it acted in reckless disregard of plaintiffs' rights. Exxon points to its extensive program not only to determine the scope of the contamination, but also to clean up the portion for which it was responsible. While this may be admirable conduct, the jury may have concluded it was too little too late. As we said, there was substantial evidence that Exxon failed to act promptly and that, as a result, contaminated ground water spred to neighboring property causing substantial health and environmental damage. In light of that, the subsequent remedial action is not sufficient to reverse a punitive damage award when it was taken two years after Exxon discovered its first leak and the time had long passed during which

Exxon could have used its expertise either to contain the leak or substantially reduce the contamination caused by it.

 As a general rule, a tortfeasor's post-tort conduct provides the trier of fact with some circumstantial evidence as to its state of mind when it committed the tortious conduct. Such conduct, however, is far from dispositive. For instance, in *Orchard View Farms, Inc. v. Martin Marietta Aluminum, Inc.*, 500 F.Supp. 984 (D.Ore.1980), the court stated that defendant's decision to recognize that pollution from its plant was damaging neighboring orchards and to compensate the orchardists for their damages was "strong evidence that the company was attempting to fulfill its societal obligations by accounting for the damage its operations were causing to its neighbors." *Orchard View Farms*, 500 F.Supp. at 1023. The court went on to say, however, that evidence of contrition and conciliation has scant relevance to defendant's state of mind when it committed the tort.

> Though laudable, this conduct does not entirely shield the company from punitive damages liability, for it came about after some eight years of the plant's operation and after the company was faced with numerous lawsuits claiming damages.

*Id.* at 1023. The similarities of *Orchard View Farms* with the instant case are obvious. Exxon delayed for several years in the investigation and clean-up of several thousand gallons of gasoline. Although its remedial actions predated litigation, the threat of law suits may well have motivated Exxon to take some action.

Although factually different, *Oursler v. B & O R.R. Company*, 60 Md. 358 (1883), supports the foregoing conclusion. The defendant in *Oursler* diverted the Patapsco River from its natural channel causing damage to the plaintiff's land. In the first suit the plaintiff established liability and recovered compensatory damages. When, after the first suit, the defendant delayed in satisfactorily resolving the problem, the plaintiff again sued for both

compensatory and punitive damages, claiming that the defendant's "continuance" of the wrongdoing constituted malicious behavior. In affirming the trial court's denial of the punitive damages award, the Court stated:

> If the deficiency was remedied with such reasonable promptness as excluded the idea of malicious continuance, exemplary damages ought not to have been awarded....
>
> It is in evidence that the ditch was dug *soon after* the first trial. How soon it does not appear; but we know from the verdict of the jury that it was *before any real damage had resulted* from the delay.

*Oursler*, 60 Md. at 372 (emphasis added). In making its determination of the effect of post-tort conduct, the Court in *Oursler* focused on two variables: the time frame within which the defendant took the remedial action and the amount of damages that occurred in the interim. In *Oursler*, the time frame was short; defendant took corrective action "soon after." As to damages, it was evident that the continuance of the wrongdoing resulted in only minor harm to plaintiff, since he received only nominal damages. In contrast, the time frame in the case *sub judice* was considerable, almost a two year delay. Moreover, the harm to plaintiffs that resulted from Exxon's delay was substantial; the jury assessed an aggregate award of $820,000.00 in compensatory damages.

For these reasons we hold that Exxon's post-tort conduct does not negate the jury's finding that it acted with malice or its legal equivalent.[8]

---

8. Review of case law from other jurisdictions bears out our conclusion. In cases where courts have ruled against a punitive damages award the facts indicate that at the first sign of trouble, the defendant promptly began to take significant steps to ameliorate the situation. *See Harrison v. Indiana Auto Shredder Company*, 528 F.2d 1107, 1125–26 (7th Cir.1975) (reversing an award of punitive damages because defendant "cooperated with all governmental agencies" and "did its best to alleviate damage, discomfort, and inconvenience"); *Atkinson v. Herington*, 200 Kan. 298, 436 P.2d 816, 825–26 (1968) (holding that defendant acted without malice or its legal equivalent when defendant took immediate measure to contain the water pollu-

## C.

### *Conduct Directed Against Particular Plaintiffs*

Finally, Exxon argues that the trial court erred by not requiring that defendant's conduct be reckless or wanton as to particular plaintiffs, i.e. S & S and the Yaremas. Specifically Exxon contends that its acts or omissions must immediately threaten important rights of the complaining plaintiffs. Since there was no contamination or physical invasion of S & S's and the Yaremas' property, any tortious conduct by Exxon, however egregious, cannot be considered to constitute a wanton or reckless disregard of the rights of these particular plaintiffs. We find this argument unpersuasive for several reasons.

First, this is an attempt to resurrect Exxon's previous contention that nuisance or any other tort action is contingent upon some physical impact or invasion upon plaintiff's property. As our analysis indicated, such a technical requirement is unnecessary. Land ownership cannot be reduced simply to the physical possession of the earth below the owner's feet. Rather, ownership consists in the acquisi-

---

tants and thus minimize its damages upon awareness of the problem). In contrast, courts have recognized that defendant's failure to take immediate post-tort corrective action to abate a nuisance may create an inference that defendant acted with malice or in wanton disregard to the rights of others. *See Knabe v. National Supply Division of Armco Steel,* 592 F.2d 841, 844–45 (5th Cir.1979) (reinstating verdict for punitive damages since (1) defendant knew that it illegally discharged pollutants into creek and "had he thought about it", one member of management testified, he would have realized livestock would be endangered; (2) Environmental Protection Agency had warned the defendant to rectify the situation, but illegal discharges continued for over two years; and (3) defendant took some remedial measures, but they "were neither thorough going nor effective"); *Atlas Chemical Industries, Inc. v. Anderson,* 524 S.W.2d 681, 688 (Tex.1975) (holding on a grant of a Motion for Rehearing that "the failure to make any correction to save downstream property owners from damage" warranted punitive damages); *Bower v. Hog Builders, Inc.,* 461 S.W.2d 784, 799 (Mo.1970) (affirming an award of punitive damages when defendant was warned of pollution overflow by affected landowner, but failed to take "any effective step to alleviate the conditions" for four years).

tion and possession of a bundle of rights and privileges in the use of that property. Plaintiffs have presented sufficient evidence to support a finding that Exxon's interference with their land use rights constituted wanton and reckless disregard for those rights.

■ Second, Exxon's interpretation of the implied malice standard does not comport with the general function of punitive damages. In Maryland, punitive damages are viewed as civil fines "awarded over and above full compensation, to punish the wrongdoer, to teach him not to repeat his wrongful conduct and to deter others from engaging in the same conduct." *Wedeman v. City Chevrolet Company,* 278 Md. 524, 531, 366 A.2d 7 (1976); *see Cheek v. J.B.G. Properties, Inc.,* 28 Md.App. 29, 34, 344 A.2d 180 (1975). The award of punitive damages does not hinge on whether the tortfeasor exhibited the requisite level of malice against a particular individual, but rather whether the defendant's breach of societal obligations is so egregious that the imposition of monetary penalty beyond actual compensation is necessary to punish the wrongdoer in order to protect society through the deterrent effect of the penalty. *See Orchard View Farms Inc. v. Martin Marietta Aluminum, Inc.,* 500 F.Supp. 984 (D.Ore.1980) (discussing the societal obligations of business enterprises not to expose others to harm and when a breach of those obligations justifies the imposition of punitive damages to punish and deter future uncooperative conduct). This position is consistent with other jurisdictions which also do not require the defendant to act with reckless disregard for the rights of a particular plaintiff. For instance, the Court in *Gravitt v. Newman,* 114 A.D.2d 1000, 495 N.Y.S.2d 439 (1985) stated: "punitive damages are available for the purpose of vindicating a public right, only where the actions of the alleged tortfeasor constitute gross recklessness or intentional, wanton or malicious conduct aimed at the public generally or are activated by evil or reprehensible motives." 495 N.Y.S.2d

at 441. Similarly, in *Franks v. Burks,* 688 S.W.2d 435 (Tenn.Ct.App.1984) the Court explained: "Punitive damages are awarded ... where a wrongful act is done with bad motive or so reckless as to imply a disregard of social obligation or where there is such willful misconduct or entire want of care as to raise a presumption of conscious indifference to the consequences." 688 S.W.2d at 438. *See generally* 22 Am.Jur.2d *Damages* § 250 (1964) (stating that "malice need not have been directed against the plaintiff, nor need the act have been done with the purpose to do a wrong").

Exxon, as a corporation that does business within the State of Maryland, owes the citizens a duty not to endanger their health and safety. There was evidence of defendant's managerial decisions to continue to use the leaking storage tanks, to delay implementation of its expertise in recovering lost product for two years, and to act in an uncooperative and clandestine manner. From this evidence the jury apparently concluded that Exxon's managerial decisions were made wholly without regard, and with conscious indifference to the rights of the appellees. Since this evidence was a sufficient basis for the jury to find that such conduct lends itself to sanctions to prevent similar conduct in the future, we will not disturb the jury's punitive damages awards.

## VI.

### *Admissibility of Testimony Concerning Hazardous Effects of Contaminated Water*

Over Exxon's objection, plaintiffs introduced expert testimony concerning the carcinogenic and other toxic effects of benzene as well as the testimony of a neighboring landowner about the contamination on her property. The trial court ruled that this evidence was relevant and admitted the testimony. On appeal Exxon contends that this evidence

improperly focused the jury's attention on the health risks associated with the contamination.

It is a well-settled rule in Maryland that evidence is admissible if it has some probative value and that this determination is left to the trial judge's discretion. *Haile v. Dinnis,* 184 Md. 144, 152, 40 A.2d 363 (1944); *Schear v. Motel Management Corporation,* 61 Md.App. 670, 682, 487 A.2d 1240 (1985). On review, appellant, Exxon, has the burden of demonstrating that the trial court committed prejudicial error in admitting the evidence. *Klingensmith v. Snell Landscape,* 265 Md. 654, 662, 291 A.2d 56 (1972). This Court "will not reverse for an error by the lower court unless that error is 'both manifestly wrong and substantially injurious.' " *I.W. Berman Properties v. Porter Brothers, Inc.,* 276 Md. 1, 11–12, 344 A.2d 65 (1975) (quoting *Rotwein v. Bogart,* 227 Md. 434, 437, 177 A.2d 258 (1962)); *see also Hance v. State Roads Commission of Maryland,* 221 Md. 164, 176, 156 A.2d 644 (1959) (stating that "[c]ourts are reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless they cause substantial injustice"). In the case *sub judice,* we hold that admission of the disputed testimony was not manifestly wrong.

The plaintiffs called Dr. William Marcus, a toxicologist with the United States Environmental Protection Agency, who testified that exposure to benzene could result in leukemia, aplastic anemia, and other fatal diseases. Dr. Marcus testified, in part, as follows:

Q. Based upon your review what have you concluded are the principal health effects associated with longterm benzene exposure?

Mr. Griffith: Objection.

The Court: Overruled.

A. My personal opinion, there are several adverse health effects benzene produces.

It produces a leukemia, it produces aplastic anemia and also has an effect on the immune system.

Q. Focusing a while on leukemia, are there specific types of leukemia associated with benzene exposure?

A. Yes.

Q. Can you tell the jury what types of leukemia are associated with benzene exposure?

A. Benzene exposure causes the type of leukemia or let's say has been associated with the type of leukemia called A.M.I. and through the years the clinical evidence of people who get this type of leukemia in one way or the other have been shown to be exposed to benzene.

Q. What is the consequences of contracting that type of leukemia?

A. People who get the leukemia inevitably die.

Q. Again, the consequences of contracting aplastic anemia is what, please?

A. Death.

Q. Is there any group of the population that is apparently at risk as a result of benzene exposure?

A. We like to consider children the greatest risk.

Exxon contends that this testimony has little or no probative value, and any value it might have is far outweighed by its prejudice to Exxon. In support of this position, Exxon points to the fact that plaintiffs have not consumed any contaminated water; they have suffered no personal injury from the effects of the contaminated water; and they seek only economic damages to their property. Exxon concludes that since this testimony relates to personal injuries and is totally different from the economic injuries claimed by these plaintiffs, it should have been excluded. *Wolf by Wolf v. Proctor & Gamble Company,* 555 F.Supp. 613, 621 (D.N.J.1982).

Exxon's argument against admissibility rests on the assumption that the Court in *Wolf By Wolf* imposed a *per se* exclusion of evidence that differs in nature and kind from the injuries alleged by plaintiffs. We, however, do not read *Wolf By Wolf* as imposing a *per se* exclusion of such

evidence, but rather requiring the exclusion of such evidence unless an alternative use for the evidence exists and then only after the court weighs probative value against unfair prejudice. We conclude that Dr. Marcus' testimony had probative value since it established the dangers inherent in gasoline contamination of ground water and the degree of care which the defendant should have used before, during and after the leakage of the gasoline. It is well established that the degree of care which a party must exercise is commensurate with the seriousness of potential consequences of the party's negligence. *Buck v. Brady,* 110 Md. 568, 578, 73 A. 277 (1909); *Baltimore & O.R.R. Company v. Breining,* 25 Md. 378, 388 (1866); *see also Allen v. United States,* 588 F.Supp. 247, 253–54 (D.C.Utah 1984); *Todd Shipyards Corporation v. Turbine Service, Inc.,* 467 F.Supp. 1257, 1286 (E.D.La.1978). Given Dr. Marcus' testimony as to the gravity of gasoline contamination, the jury could have imposed a higher standard of care on Exxon, commensurate with these grave risks. Finding no extreme prejudice that outweighs the probative value of the evidence, we hold that the trial court did not err in ruling that Dr. Marcus' testimony was admissible.

■■■ Exxon also complains that the trial judge should have excluded Mrs. Weir's testimony that defendant's maintenance representative failed to inform her that Exxon had lost gasoline product from its service station and, contrary to what Exxon actually knew, offered as explanation that her ground water contamination stemmed from deterioration from farm equipment.

Since this testimony was probative of Exxon's attitude toward its responsibility to the community for the gasoline leaks and the resulting contamination, the court did not err in admitting it.

JUDGMENTS AFFIRMED;

COSTS TO BE PAID BY APPELLANT.